STATE of Tennessee

v.

Jerry W. HAYES, Jr.

Supreme Court of Tennessee,
at Knoxville.

Nov. 16, 2005 Session Heard
in Kingsport.[1]

April 20, 2006.

---

1. Oral argument was heard in this case on November 16, 2005, in Kingsport, Sullivan County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

Ardena J. Garth, District Public Defender; Donna Robinson Miller (on appeal) and Steven D. Brown (at trial), Assistant District Public Defenders, for the Appellant/Defendant, Jerry W. Hayes, Jr.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; John H. Bledsoe, Assistant Attorney General; William H. Cox, III, District Attorney General; and David Denny, Assistant District Attorney General, for the Appellee/Plaintiff, State of Tennessee.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

After being stopped for an identification check at the street entrance to a public housing development, Defendant, Jerry W. Hayes, Jr., was charged with driving on a suspended license and being a minor in possession of alcohol. Defendant moved to suppress the evidence collected as a result

of the stop, arguing that the stop was an unconstitutional seizure. The trial court granted Defendant's motion to suppress, and the State obtained permission to appeal. The Court of Criminal Appeals reversed the trial court, and Defendant sought permission to appeal to this Court. We granted this appeal to answer a question of first impression: whether an entry identification checkpoint at which police officers stop and question persons attempting to enter a public housing development, whose conduct is unremarkable and free from suspicion, is an unreasonable seizure in violation of the United States Constitution and article I, section 7 of the Tennessee Constitution. Under the facts presented in this case, we answer that question in the affirmative. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the trial court's judgment granting Defendant's motion to suppress. The case is remanded to the trial court for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

The federally-subsidized Chattanooga Housing Authority ("the CHA"), a governmental entity, operates Poss Homes, which provides housing for low-income families. As part of their obligations as tenants, the residents sign a contract in which they agree not to allow into their homes "people that are intoxicated, selling drugs or causing problems." The tenants also agree not to permit on their premises persons convicted of violent crimes, selling drugs, or public intoxication.

The CHA operates its own police department, which has full concurrent jurisdiction with the Chattanooga Police Department inside Poss Homes. From July 5, 2002, to October 11, 2002, Officer Ralph Brown served as a criminal investigator with the CHA.

On the afternoon of August 13, 2002, pursuant to an entry identification operation, Officer Brown stationed himself at 2409 Washington Street, which is inside Poss Homes. At about 6:30 that evening, Defendant drove his vehicle down 25th Street and turned onto Washington Street. Officer Brown stopped him and walked up to his car. At this point, Officer Brown had seen nothing to indicate any suspicious activity on Defendant's part. However, as he approached the vehicle, Officer Brown noticed two quarts of unopened beer on the floorboard of the front passenger seat. Defendant asked why he was being stopped, and Officer Brown explained that they were "doing an ID check" and "checking to see if people live here." Upon request, Defendant gave Officer Brown his driver's license. Officer Brown checked the status of the license and determined that it had been suspended for nonpayment of fines. Officer Brown further determined from the license that Defendant was two months shy of twenty-one years old, making his possession of alcohol illegal. Defendant told Officer Brown that he was visiting friends at Poss Homes and that his uncle had bought the beer. Officer Brown ordered Defendant to pull to the side of the road and park. Officer Brown then wrote Defendant a citation and confiscated the beer. Defendant was subsequently charged with driving on a suspended license and possessing alcohol while a minor.

In response to his indictment, Defendant filed a motion to suppress the evidence gathered as a result of his stop on the grounds that the stop violated both the federal and state constitutions.

At the suppression hearing, Officer Brown explained that police officers for both the CHA and the City of Chattanooga have jurisdiction to operate on properties owned by the CHA. He also stated that

one of his "special mandates" from the CHA was to "check [identifications] for people coming in there." Officer Brown testified that the CHA had prepared photo identification badges for the residents of Poss Homes and that they had been distributed as of the time of the instant stop.[2]

To further facilitate the identification system, the CHA, through Officer Brown and unspecified others,[3] conducted entry identification checkpoints at one of the entrances to Poss Homes.[4] This checkpoint was located on Washington Street off 25th Street, a thoroughfare that had been "ceded" to the CHA by the City of Chattanooga. The checkpoint was operated "about two or three times a week," "at random . . . usually late afternoon." Pursuant to the checkpoint, Officer Brown "[u]sually" stopped both motorists and pedestrians. He explained the purpose of the identification system as follows:

> Basically to make sure that people lived there that were coming in there and not people that were coming in there that were causing problems with selling drugs, drunkenness and various type of crimes. People were allowed to come in there to visit relatives and that's mainly what we were checking.

He also stated, "the main thing was just keep—to help the people's quality of life issues in there, keep people out of there that were committing crimes and were just loitering around, littering, dropping off trash and so forth and committing other kind of crimes."

Officer Brown described the checkpoint procedure as follows:

> Well, basically, we would check and see if they had an ID to live in that residence. Also we would check their driving license. We would ask them a bunch of questions. "Do you live here? Are you visiting someone here?" And at some point—if they were visiting people, we would let them in. They would give us the address and names.

He explained his particular approach:

> What I do, I'd wait till they got on the housing property. The first thing I would do is what I call a greeting, "How are you doing. Good afternoon." Then after that I'd say, "I'm Ralph Brown, criminal investigator for Chattanooga Housing Authority." Then I would tell them the reason why I stopped them, I'm checking IDs, see if you live here in this residence—I mean this housing development.
>
> After that I'd ask for a form of identification, a driving license, and after that point sometimes I'd ask for registration and insurance, and after that I would make a final decision on what I was going to do.

There were no posted signs or warnings that persons wanting to enter Poss Homes were subject to being stopped and interrogated.

When asked if there was a "neutral and explicit plan governing the operation of the checkpoint," Officer Brown responded in the affirmative, explaining: "Everyone that came in there was treated the same,

---

**2.** Erma Joyce, Defendant's grandmother and member of the CHA board for thirteen years, testified that the identification badges for the residents of Poss Homes had not yet been distributed as of August 2002.

**3.** As noted by the trial court in its written memorandum accompanying its order granting Defendant's motion to suppress, Officer

Brown's testimonial references to "we" and "us" imply that more than one officer was present at a checkpoint. However, no other officer was mentioned by name.

**4.** Officer Brown acknowledged that there were alternate routes into and out of Poss Homes.

even residents. We'd make sure that they got to Washington Street, not on 25th Street when we made the stop." When asked about the limits on his discretion in conducting the checkpoint, he stated, "I could not stop anybody on 25th Street because those streets belong to the City of Chattanooga." Officer Brown also stated that, at the checkpoint, he stopped "pretty much everybody that came in there because a lot of the times people live there for a short time and they will move out." He also felt that stopping everyone "was a fair way of doing it." Officer Brown stated that the checkpoint plan was put into place by CHA Chief Jeff Hazelwood. Officer Brown further testified that, prior to Officer Brown's authorization to conduct the checkpoints, Chief Hazelwood discussed with him state and federal case law about how the checkpoints were to be conducted.

In support of the checkpoint operation, the prosecution introduced two documents into evidence through Officer Brown. The first document, a "Position Description" for a CHA criminal investigator, makes no mention of checkpoints. The other document is a memorandum on Chattanooga Housing Police letterhead from Jeff Hazelwood to "All Investigators."[5] The sole reference to checkpoints in the memorandum is the initial paragraph: "When making your daily assignment rosters, please remember that *we can only do ID Checkpoints in developments where we own the streets*. At this time that is only Poss Homes and College Hill Courts. You have no legal standing to do a check point on a public roadway." As noted by the trial court, "any plan [governing operation of the checkpoint] was apparently unwritten."

The State adduced no proof about how many persons the CHA Police turned away at the checkpoints as unauthorized. The State also failed to adduce any evidence about who, precisely, had been committing crimes in the Poss Homes community. The record contains no evidence that illegal conduct within Poss Homes decreased after the checkpoint plan was put into operation.

After two hearings, the trial court granted Defendant's motion to suppress, finding the stop to have been "an unreasonable seizure." On appeal, the Court of Criminal Appeals reversed the trial court, concluding that "the checkpoint stop was reasonable under Fourth Amendment principles and thus constitutional." For the reasons set forth below, we now reverse the intermediate appellate court and reinstate the trial court's judgment granting Defendant's motion to suppress the evidence obtained as a result of the illegal stop.

## STANDARD OF REVIEW

■■■■ This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn.2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g., State v. Wal-*

**5.** We note that the memorandum is dated August 29, 2002, approximately two weeks after the instant stop took place.

*ton,* 41 S.W.3d 75, 81 (Tenn.2001); *State v. Crutcher,* 989 S.W.2d 295, 299 (Tenn.1999).

## ANALYSIS

■ Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures by government agents.[6] *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *Keith,* 978 S.W.2d at 865 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). This Court has noted previously that "[a]rticle I, [section] 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." *Sneed v. State,* 221 Tenn. 6, 423 S.W.2d 857, 860 (1968).

■ Under both constitutions, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); *see also State v. Garcia,* 123 S.W.3d 335, 343 (Tenn.2003). A police officer's stop of an automobile, even for the short period involved in a checkpoint, constitutes a seizure under both the United States and Tennessee Constitutions.[7] *See Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *State v. Vineyard,* 958 S.W.2d 730, 734 (Tenn.1997). Therefore, to be considered "reasonable," a warrantless stop of a driver must fall under an exception to the warrant requirement. The issue we must decide is whether the instant checkpoint fits within one of those exceptions.

## I. Validity of Stop Under Fourth Amendment

■ The United States Supreme Court has not addressed specifically the validity of entry identification checkpoints. The Court has spoken several times to the Fourth Amendment viability of other roadblocks and/or checkpoints. In *United States v. Martinez–Fuerte,* 428 U.S. 543, 545, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), it held that brief, suspicionless seizures of motorists at fixed Border Patrol checkpoints that were designed to intercept illegal aliens passed Fourth Amendment muster. Likewise, sobriety checkpoints aimed at removing drunk drivers from the road were upheld in *Sitz,* 496 U.S. at 455, 110 S.Ct. 2481. In *Prouse,* 440 U.S. at 663, 99 S.Ct. 1391 the Court suggested that a similar type of roadblock aimed at verifying drivers' licenses and vehicle registrations would be permissible in pursuit of highway safety. In *Illinois v. Lidster,* 540 U.S. 419, 423, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), the Court considered a highway

---

**6.** The Fourth Amendment is applicable to the states pursuant to the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**7.** In its brief to this Court, the State conceded that Officer Brown's stop of Defendant was a seizure under both constitutions.

checkpoint whose "primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime" that had been committed in the same area at about the same time several days earlier. The Court concluded that the checkpoint was constitutional. *Id.* at 427, 124 S.Ct. 885.

■■■ The United States Supreme Court has made clear, however, that roadblocks aimed at general crime control contravene the Fourth Amendment. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). In *Edmond,* the City of Indianapolis instituted roadblocks designed to discover and interdict the actual trafficking of illegal narcotics. Upon review of its previous decisions in this area, the Court determined that it had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing," *id.* at 41, 121 S.Ct. 447, and noted that it had "suggested in *Prouse* that [it] would not credit the 'general interest in crime control' as justification for a regime of suspicionless stops." *Id.* (quoting *Prouse,* 440 U.S. at 659 n. 18, 99 S.Ct. 1391). The Court explained its concern with such seizures: "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42, 121 S.Ct. 447. The Court thus determined that it could not sanction "stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any

given motorist has committed some crime." *Id.* at 44, 121 S.Ct. 447. Accordingly, the Court "decline[d] to approve a program whose primary purpose is ultimately indistinguishable from the general interest in crime control," *id.,* and held that, "[b]ecause the primary purpose of the Indianapolis checkpoint program is ultimately indistinguishable from the general interest in crime control, the checkpoints violate the Fourth Amendment." *Id.* at 48, 121 S.Ct. 447.

In contrast with the roadblock in *Edmond,* the checkpoint at issue in this case was aimed not at apprehending those already involved in illegal activity, but at *preventing* some ill-defined group of persons from engaging in such activity in the first place, at least at a particular location. Officer Brown testified that the CHA was "having a lot of problems with drugs and various other type of crimes at the time." In response, the CHA devised the checkpoint plan to limit those who could enter its housing developments. The goal of the plan was "to help the people's quality of life issues in there, *keep people out of there that were committing crimes and were just loitering around, littering, dropping off trash and so forth and committing other kind of crime.*" (emphasis added). The trial court described the operation as "an entry checkpoint for the purpose of excluding trespassers."

By the State's own admission in its brief to this Court, the CHA's interest in establishing the checkpoint was "reducing crime and excluding trespassers" and "enforcing lease agreement provisions intended to decrease crime and drug use."[8] Such a checkpoint is not tenable under the Fourth Amendment. *Edmond,* 531 U.S. at 48, 121 S.Ct. 447; *see also Hagood v. Town of*

---

8. Contractual provisions are enforceable against the parties to the contract. We are not willing to extend methods of enforcement to include violating the constitutional rights of those persons who are not parties to the contract.

*Town Creek,* 628 So.2d 1057, 1060 (Ala. Crim.App.1993) (holding roadblock established to prevent fighting, public drunkenness, and disorderly conduct at apartment complex violated Fourth Amendment because the state's "general interest in law enforcement simply does *not* outweigh the liberty interests of those seized, however brief the seizure may be"). We hold, therefore, that the checkpoint at issue in this case violated Defendant's right against unreasonable seizures under the Fourth Amendment to the United States Constitution.

## II. Validity of Seizure Under Article I, Section 7

 Because this Court is the final arbiter of the Tennessee Constitution, and because this case presents an issue of first impression before this Court, we also choose to address the validity of the instant entry identification checkpoint under article I, section 7 of the Tennessee Constitution. This Court has twice previously analyzed the validity of roadblocks under our constitution. In *State v. Downey,* 945 S.W.2d 102, 103 (Tenn.1997), the defendant was arrested after being stopped at a sobriety roadblock. In determining whether the stop was constitutional under article I, section 7, this Court adopted the balancing approach set forth in *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and utilized by the United States Supreme Court in *Sitz* for analyzing whether a sobriety checkpoint passed muster under the federal constitution. *Downey,* 945 S.W.2d at 110. That approach involves the weighing of three significant factors: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown,* 443 U.S. at 50–51, 99 S.Ct. 2637. This balancing approach is to be applied with the under-

standing that "the overriding question is whether the roadblock was established and operated in a constitutionally reasonable manner that minimized the intrusion on individuals and limited the discretion afforded to officers at the scene." *Downey,* 945 S.W.2d at 110.

Applying the *Brown/Sitz* balancing approach to the roadblock at issue in *Downey,* we first recognized "the State's compelling interest in detecting and deterring motorists who drive while under the influence of alcohol." *Id.* We further recognized that "roadblocks are effective tools in advancing the State's interest in solving a serious public danger." *Id.* The particular sobriety roadblock at issue failed to pass muster under Tennessee's constitution, however, because it was not "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers," *id.,* and did not sufficiently limit the discretion of the officers at the scene. *Id.* at 111.

We revisited the issue of roadblocks in *State v. Hicks,* 55 S.W.3d 515, 519 (Tenn. 2001) (plurality opinion), which involved a roadblock ostensibly established to discover unlicensed drivers. In *Hicks* we "reaffirm[ed] that the test adopted in *Downey* is to be applied in all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution." *Id.* at 524. Accordingly, we turn now to whether the instant checkpoint passes that test.

### A. Nature of the State's Interest

 The first prong of the test examines the gravity of the public concerns served by the checkpoint. In *Downey,* we recognized the State's compelling interest in detecting and deterring inebriated drivers on the basis of "overwhelming" statistics indicating that "more deaths and inju-

ries have resulted from such motor vehicle accidents on our nation's highways than from all the wars this country has fought." 945 S.W.2d at 110 (citing *Sitz*, 496 U.S. at 456, 110 S.Ct. 2481 (Blackmun, J., concurring)). Additionally, we noted the "carnage and tragedy ... recorded daily in our newspapers and on our television screens," and the repeated efforts of our legislature to strengthen our laws against driving under the influence. *Id.* at 104. In the subsequent *Hicks* case, the State argued that the roadblock had been established "to ensure highway safety by detecting and deterring unlicensed drivers." *Id.* at 525. Unlike the situation with drunk drivers, however, we did not have in *Hicks* the benefit of overwhelming statistics, daily media reports, and repeated legislative action establishing the connection between unlicensed motorists and highway safety. Nor did the record contain any evidence proving that drivers not possessing a license were a threat to highway safety. *Id.* at 527.

Two members of this Court opined in *Hicks* that a driver's license roadblock would withstand scrutiny under the first prong of the *Downey* test only if the State showed

> that drivers not possessing a license are unable to safely operate motor vehicles on the roads and highways of this state; that an unlicensed driver invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention.

*Id.* at 527. In a concurring opinion, two other members of this Court concluded that the roadblock was unconstitutional per se because "there is no basis upon which to reasonably conclude that a motorist who is not in possession of a valid drivers' license *necessarily* poses an immediate danger of death or serious bodily injury great enough to warrant the suspicionless stop of *all* drivers at a checkpoint." *Id.* at 540 (Anderson, C.J., concurring). Under both analyses, the *Hicks* roadblock failed to satisfy the first prong of the *Downey* test. *Id.* at 538–39, 541. Clearly, the State faces a significant challenge in demonstrating that its reason(s) for establishing a checkpoint are "sufficiently compelling so as to justify suspicionless stops" of our citizens. *Id.* at 525.

In the instant case, the entry identification checkpoint was established, according to the State, to ensure residential safety by detecting and deterring unauthorized visitors. Although the trial court assumed arguendo the State's interest to be compelling, this Court "will not presume the presence of a compelling state interest to justify further expanding the scope of permissive suspicionless seizures." *Id.* at 527. Rather, "[b]ecause the exceptions to the warrant requirement 'are jealously and carefully drawn,' the State must *show* that 'the exigencies of the situation made the search [or seizure] *imperative.*'" *Id.* (quoting *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn.1996)) (initial emphasis added).

As in *Hicks*, we have in this case no overwhelming statistics, daily media reports, or repeated legislative actions before us which establish a causal connection between unauthorized visitors to the Poss Homes community and risk or harm to its residents. Moreover, the State has offered us no proof that unauthorized visitors to Poss Homes necessarily threaten its residents' safety. As in *Hicks*, then, the State has failed in this case to demonstrate that its interest in establishing the instant checkpoint was sufficiently compelling to pass muster under the Tennessee

Constitution. The instant checkpoint therefore "necessarily fail[s] constitutional examination" under article I, section 7. *Id.*

## B. Degree to Which the Checkpoint Achieves the State's Asserted Interest

■ The instant checkpoint also fails to satisfy the second prong of the *Downey* test, which is met "when one can fairly say that [it] contribute[s] in a meaningful way to achieving the sufficiently compelling state interest." *Hicks,* 55 S.W.3d at 531. Here, the State's asserted interest was to ensure the safety of the Poss Homes residents. The method employed to advance this interest was an entry identification checkpoint, ostensibly operated to keep out unauthorized visitors. There is no proof in the record, however, which establishes that checking the identification of those who sought entrance somehow decreased the level of crime being committed within Poss Homes. Moreover, there is no proof in the record that it was unauthorized visitors who were threatening the residents' safety. While Officer Brown testified that the Poss Homes community was plagued with criminal activity, neither he nor anyone else testified as to who, precisely, was responsible for this misconduct. We cannot simply assume that it was only unauthorized visitors who were "just loitering around, littering, dropping off trash and so forth and committing other kind of crimes." It is possible that it was the residents of Poss Homes who were themselves engaging in illegal conduct. In short, there is no proof in the record that links the checkpoint to its purported aim.

The checkpoint even fails insofar as it was established simply to deflect would-be trespassers. The State asserts in its brief to this Court that "nothing stops trespassers or dissuades them from entering more effectively than approaching them and asking for identification." There is no proof in the record to support this assertion, however. The intermediate appellate court found that "[t]he identification checkpoint is an efficient means of determining that persons entering the housing development are residents or visitors with a legitimate business or social reason for being there." We disagree. Certainly, if someone trying to enter the development produced either a Poss Homes identification badge or a driver's license indicating a Poss Homes residence, the checkpoint would be effective at establishing that the person had, at least at some point in time, been a resident there.[9] A driver's license with a non-Poss Homes address would be useless, however, at indicating whether the would-be visitor—or brand new resident—had a legitimate reason for being there. Furthermore, unless Officer Brown had either a list of current residents or had memorized their names, he would not be able to verify a visitor's assertedly "legitimate" connection with a resident simply upon being given a name and address. Officer Brown offered no proof that he either had such a list or knew all of the residents by name.

The checkpoint also fails in practical effect because the location at which it was established was not the only point of ingress into the community. Consequently, a person refused admittance at the Washington Street entrance could simply leave and gain entry into the development via another route. This aspect of the checkpoint completely undercuts Officer Brown's ostensible function as a gatekeeper of the community. For all of these

---

9. Officer Brown testified that "a lot of the times people live there for a short time and they will move out."

reasons, we conclude that the instant checkpoint did not contribute in a meaningful way to achieving the State's asserted interest and is therefore not constitutionally reasonable.

### C. Limitation on Discretion of Officers Operating Checkpoint

██ The checkpoint in this case also fails the third prong of the *Downey* test: that to be constitutionally reasonable, a roadblock must be "established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene." 945 S.W.2d at 104. We clarified in *Hicks:*

> the most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field. Two facts are critical to finding that the officers' discretion on the scene was properly limited: (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock. In all cases, therefore, the State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation. *To be clear, these factors are so essential to a reasonable roadblock that the absence of either of them will necessarily result in the invalidation of the stops.*

55 S.W.3d at 533 (emphasis added) (citation omitted). Later in the *Hicks* decision we stressed that "active and careful supervision is critical to the constitutional reasonableness of any roadblock...." *Id.* at 536.

In this case, it is unclear whose decision it was to set up the checkpoint in the first instance. Officer Brown indicated that the checkpoint was operated pursuant to a "special mandate" from the CHA and that the checkpoint plan was formulated by Chief Hazelwood. However, Officer Brown also indicated that the checkpoints were operated at "random" times, "usually" in the late afternoons. The trial court found that there was "no evidence regarding who was responsible for deciding the precise location(s), frequency, and times of checkpoints."

██ Even without definitive proof that it was Officer Brown who both decided to establish this particular checkpoint and then established it, the checkpoint fails constitutional muster because of the utter lack of supervision over his methodology in conducting the checkpoint. In this case, the only "predetermined operational guideline" in place regarding this checkpoint was that it could be operated only on streets owned by the CHA. As to its actual operation, Officer Brown testified:

> What I do, I'd wait till they got on the housing property. The first thing I would do is what I call a greeting, "How are you doing. Good afternoon." Then after that I'd say, "I'm Ralph Brown, criminal investigator for Chattanooga Housing Authority." Then I would tell them the reason why I stopped them, I'm checking IDs, see if you live here in this residence—I mean this housing development.
>
> After that I'd ask for a form of identification, a driving license, *and after that point sometimes I'd ask for registration and insurance, and after that I would*

*make a final decision on what I was going to do.*

(emphasis added). Officer Brown's own testimony indicates that he determined, in his discretion, what documentation he would request and then determined, in his discretion, what he would do about the particular visitor to the development.[10] This discretion was, so far as the record indicates, unfettered. Where "the officers actually conducting the checkpoint [have] virtually complete discretion to decide for themselves the procedures to be used in its operation," *id.* at 535, the checkpoint fails to pass muster under our Constitution. *Id.* at 536.

Finally, there are elements of subterfuge evident in the operation of this entry identification checkpoint. First, Officer Brown testified that, upon stopping a person seeking entrance into Poss Homes, he "would check and see if they had an ID to live in that residence.[11] *Also* we would check their driving license." (emphasis added). If the checkpoint was being operated solely to establish a legitimate connection between the would-be entrant and the community, however, Officer Brown had no reason to "also" demand the person's driver's license if he or she had already produced a Poss Homes identification badge. Second, Officer Brown testified that, in addition to seeking multiple forms of identification from people trying to enter Poss Homes, he sometimes sought vehicle registration and proof of insurance documents. Because persons may legitimately drive vehicles belonging to others, however, a vehicle registration document is of questionable value in determining the identity of the driver. Proof of insurance is relevant to nothing other than determining compliance with the provisions of Tennessee Code Annotated chapter twelve. *See* Tenn.Code Ann. §§ 55–12–101–140. Those provisions have no logical connection to deflecting would-be trespassers from public housing developments. We disagree, therefore, with the intermediate court's conclusion that the checkpoint stops were "aimed solely at ascertaining the person's connection to the neighborhood." If that were the case, Officer Brown would not have requested these latter documents, even "sometimes."

▇▇▇▇ Since checking vehicle registration and proof of insurance have nothing to do with the State's claimed interest in the instant entry identification checkpoint, we may infer that Officer Brown was "pursuing investigatory agendas that were wholly distinct and apart from the State's claimed interest." *Hicks,* 55 S.W.3d at 537. As we stated in *Hicks,* and reiterate here, "[w]hen police officers are permitted, either through administrative design or supervisory neglect, to actively engage in suspicionless investigation of criminal activity wholly unrelated to the purposes of the roadblock, the constitutional protections afforded by [a]rticle I, section 7 are rendered utterly without effect or meaning." *Id.* at 538. Accordingly, "a checkpoint designed or operated to further illegitimate law enforcement practices under the pretext of a lawful purpose is unreasonable under [a]rticle I, section 7, irrespective of other indicia of reasonableness." *Id.* at 536. Therefore, we hold that

---

10. Indeed, the State admits in its brief that, once Officer Brown obtained the information he wanted, he "determine[d] what [was] going on and how to proceed." This is a perfectly serviceable description of complete discretion.

11. This testimony is consistent with Officer Brown's claim that the Poss Home identification badges had been made and distributed by the time he stopped Defendant.

the instant checkpoint fails to pass constitutional muster for this reason, as well.

## CONCLUSION

We do not make light of the safe housing needs of those persons residing in Poss Homes and other public housing developments. Certainly, a significant police presence within these neighborhoods would be helpful to achieving that end, and we laud the efforts of our law enforcement personnel to halt crime in these areas and apprehend wrongdoers. In their zeal to preserve and protect, however, our police officers must respect the fundamental constitutional rights of those they are sworn to serve. Entry identification checkpoints of the type used here result in the abrogation of one of those fundamental constitutional rights. Such checkpoints cannot, therefore, be countenanced, no matter how lofty their goals. The ends, in this case, simply do not justify the means.

We hold that Defendant's stop and seizure pursuant to the CHA entry identification checkpoint at Poss Homes violated his rights under both the federal and Tennessee constitutions. The judgment of the Court of Criminal Appeals is therefore reversed, and the judgment of the trial court is reinstated. This case is remanded to the trial court for further proceedings consistent with this opinion.

The costs of this appeal are taxed to the State of Tennessee.