IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

**STATE OF TENNESSEE v. TIMOTHY GARVIN ODOM**

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 07-01-0494     J. Weber McCraw, Judge**

_____

**No. W2008-00795-CCA-R3-CD  - Filed September 21, 2009**

_____

Following a jury trial, Defendant, Timothy Garvin Odom, was found guilty of rape of a child, a Class A felony.  The trial court sentenced Defendant as a Range One, standard offender, to eighteen years. On appeal, Defendant argues that (1) the evidence was insufficient to support his conviction; (2) the trial court erred in denying his motion to suppress his statement; and (3) the trial court erred in its sentencing determinations.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Timothy Garvin Odom.

Robert E. Cooper, Jr., Attorney General and Reporter; Mary W. Francois, Assistant Attorney General; D. Michael Dunavant, District Attorney General; Joe Van Dyke, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Investigator Mike Kennamore, with the Hardeman County Sheriff's Department, testified that he was contacted by the Department of Children's Services on April 26, 2007, concerning a complaint made by the victim, E.D., who was eleven years old. (The minor victim will be referred to by her initials).  E.D. was interviewed at the Carl Perkins Center, and Investigator Kennamore watched the interview in a separate room via a closed circuit television.  Investigator Kennamore said that the victim ran "through a range of emotions" during the interview.  Initially, E.D. was "closed up," looking down, and then she began to open up as the interviewer continued to talk. Investigator Kennamore said that E.D. at that point became upset and was embarrassed.  During the interview, the victim eventually said that Defendant had penetrated her vaginally with his penis.  A

warrant for Defendant's arrest was issued, and it was discovered that Defendant had left Hardeman County.

Investigator Kennamore received information that Defendant was residing in Forrest, Mississippi. On June 20, 2007, Defendant was arrested in Mississippi and transported back to Tennessee. Investigator Kennamore stated that he interviewed Defendant at the Hardeman County Sheriff's Department on June 21, 2007. Defendant was read his Miranda rights, indicated he understood his right not to continue with the interview, and executed a written waiver of those rights. Investigator Kennamore said that he and Defendant conversed for awhile, and then Defendant gave a written statement concerning E.D.'s allegations. The statement was introduced as an exhibit at trial and read to the jury. In his statement, Defendant acknowledged that he knew the victim and that he had had sexual contact with her. In his statement, Defendant said that the victim had been flirting with the boys in the neighborhood. Defendant explained:

> I said I was going to tell on her to her mother, and she said, "No, don't do that." I think I said yes because [the victim's mother] needs to know how she had been conducting herself with them boys and all. She kind of got whiney, saying "don't tell." I was pretty well wasted that day. She shoved me down on the bed. If I remember correctly, she was unbuttoning her pants. She pulled my shorts down – when I say shorts, I mean boxers. She got on top of me and she started rubbing, bumping, grinding or whatever you want to call it. I finally pushed her off of me. I stood up and put my shorts on. I told myself, "I need to get out of this mess," and I left.

When asked whether his penis had penetrated the victim's vagina, Defendant responded, "It felt real warm but it never did go in." Defendant said that he had drunk one and one-half forty-ounce bottles of beer. Defendant stated that the incident occurred in his bedroom, and he said that the victim was twelve years old.

On cross-examination, Investigator Kennamore acknowledged that Defendant cooperated with the investigation. Investigator Kennamore stated that the victim did not give a specific date in March as to when the incident occurred, and he acknowledge that the offense could have been committed in late February. Investigator Kennamore acknowledged that E.D. was not examined by a physician, but he believed that a medical examination would not have revealed any evidence pertinent to the case.

E.D. testified that she lived in a three bedroom house with her mother, Geneva Denney, and three brothers, Nathan, John-John, and Eric. E.D. said that Defendant also lived with the family at the time of the offense. E.D. stated that Eric and John-John shared a bedroom, Nathan slept on the couch, she shared a room with her mother, and Defendant slept in the third bedroom. On the night of the offense, E.D., one of her brothers, and Defendant were watching a movie in Defendant's bedroom from Defendant's bed. E.D. said she was dressed in jeans and a shirt, and Defendant was wearing boxer shorts. At some point, E.D.'s brother left Defendant's bedroom. E.D. stated that she

fell asleep during the movie. E.D. said that Defendant then removed her clothes and penetrated her in her "private part" with his "private part." E.D. said that the incident lasted between ten and twenty minutes. Defendant told E.D., "Don't tell your mama or you're not going to have nowhere else to live." E.D. acknowledged that Defendant paid some of the family's bills.

E.D. said that she told her mother about the incident some time later. Ms. Denney confronted Defendant and told him that she was going to call the sheriff's department, and Defendant "ran out the door." E.D. stated that she was eleven years old at the time of the offense.

On cross-examination, E.D. said that her brothers asked her mother if Defendant could live with them, and Ms. Denney agreed. E.D. stated that her mother felt sorry for Defendant because he had cancer. E.D. said that the incident occurred at approximately 10:00 p.m. on a weekday night. E.D.'s brother, Nathan, was supposed to stay with E.D. while her mother went to pick up her other brothers from work, but Nathan went over to his uncle's house and left E.D. alone with Defendant.

E.D. said that after the incident, Defendant's son and daughter-in-law, Kevin and Alisha Odom, came to live with them. E.D. told Ms. Odom about the incident after Defendant complained to Ms. Denney about E.D.'s failure to do her homework. Ms. Odom told Ms. Denney that E.D. had something to tell her, and E.D. then told Ms. Denney.

Ms. Denney testified that she met Defendant while she was living with her mother in Byhalia, Mississippi. Ms. Denney's sons, John and Nathan, became friends with Defendant who lived two doors down from the Denneys. Ms. Denney said that Defendant was divorced and had cancer at the time. When Ms. Denney decided to move to Tennessee, her sons asked her if Defendant could come with them. Ms. Denney said that she did not have a job at the time, and Defendant's disability check would cover the family's bills, so she agreed. Ms. Denney said that she never had a romantic relationship with Defendant.

Ms. Denney said that Kevin and Alisha Odom arrived at the house. Ms. Denney was in her bedroom when they rushed in and told her to listen to what E.D. had to say. Ms. Denney immediately confronted Defendant about the incident. Defendant responded, "Geneva, do you think I would do something like that?" Ms. Denney told Defendant she was going to call 911 and the sheriff's department. Defendant ran out of the house, jumped into his truck, and left. Ms. Denney said that Kevin Odom actually reported the incident to the sheriff's department. Ms. Denney explained that her oldest daughter "was done the same way by a former boyfriend's friend." Ms. Denney stated:

> I went all the way, and his daddy was the Sheriff. He ran. They never prosecuted or nothing. They just let it go. It just went through the system, and I figured it would do the same with [E.D.] so I didn't push.

The State rested its case-in-chief, and Defendant put on his defense. Defendant testified that he was fifty-two years old, that his cancer was in remission, and he suffered from depression.

-3-

Defendant said that he had been receiving social security benefits for approximately five years because he was unable to work. Defendant stated that he paid some of Ms. Denney's bills in exchange for room and board. Defendant considered Ms. Denney a close friend. Defendant described his relationship with his son as "poor" because Kevin Odom had a drug problem. Defendant stated that he tried to be like a grandfather to Ms. Denney's children. Defendant said, "I just love them to death, you know." Defendant said that his heart was broken over E.D.'s allegations, but he "still care[d] for them very deeply."

Defendant said that in addition to Ms. Denney and her four children, Kevin and Alisha Odom and their baby, and Defendant's four grandchildren also lived in the house. Defendant stated the incident occurred on a Sunday between approximately 5:00 p.m. and 5:30 p.m. and that everybody was at home. Defendant said that E.D. was mad at him that Sunday because he had admonished her when E.D. "flashed" the young man across the street. Defendant said that E.D. pushed Defendant down on his bed and began striking and kicking him. Defendant pushed E.D. off the bed on to the floor. Defendant denied that there was any sexual contact between him and E.D. Defendant said that he was weak from his chemotherapy, and E.D. was taller than Defendant and weighed more.

Defendant said that his son came into the bedroom and then Ms. Denney. Kevin Odom threatened to beat up Defendant, and Defendant told them he would go to his sister's house in Mississippi until "everybody cools down." Defendant said that he was scared of his son. Defendant did not recollect Ms. Denney asking him if he had touched E.D. Defendant said that he exchanged a few letters with Ms. Denney while he was in Mississippi, and Defendant's sister talked to Ms. Denney by telephone.

Defendant said that his statement to Investigator Kennamore concerning his sexual contact with E.D. was untrue. Defendant stated that Investigator Kennamore "was pretty rough," and "got in [his] face real hard." Defendant denied that he initiated any sexual contact with E.D.

On cross-examination, Defendant acknowledged that he did not say that E.D. slapped or struck him in his statement to Investigator Kennamore. Defendant denied that E.D. pulled down his boxers or that he had any type of sexual contact with her. Defendant acknowledged that he knew he had been charged with rape of a child at the time that he gave his statement, but stated that he did not know the length of his potential sentence until later. Defendant said that he last underwent chemotherapy approximately one year before the incident.

The State called as a rebuttal witness Angela Anders, a correctional officer with the Hardeman County Sheriff's Department. On June 21, 2007, Investigator Kennamore asked Officer Anders to step into the interview room and read Defendant's statement to him because Defendant did not have his glasses with him. Officer Anders read the statement to Defendant, and then she signed the statement along with Defendant and the investigating officers.

## II. Sufficiency of the Evidence

On appeal, Defendant argues that the evidence is insufficient to support his conviction. Defendant points out that the incident was not reported for approximately two months, and the incident could not have occurred as the victim described because of the number of people in the house on the day of the incident. Defendant submits that there was a factual dispute as to whether sexual penetration had occurred, and yet the victim was not medically examined after the incident.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant was convicted of rape of a child which requires the State to prove that (1) Defendant unlawfully sexually penetrated the victim, (2) who was less than thirteen years old, and that (3) Defendant acted intentionally, knowingly, or recklessly. T.C.A. § 39-13-522. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body ... into the genital or anal openings of the victim's ... body, but emission of semen is not required." T.C.A. § 39-13-501(7).

Viewing the evidence in a light most favorable to the State, the victim testified that she was left alone with Defendant in Defendant's bedroom as she watched a movie video. The victim said that Defendant removed her clothes and penetrated her "private part" with his "private part," and the incident lasted between ten and twenty minutes. The victim testified that she was eleven years old at the time of the offense.

The crux of Defendant's argument on appeal challenges the credibility of both the victim and his statement to the investigating officer acknowledging that he had engaged in sexual conduct with the victim. The jury heard Defendant's testimony at trial denying the truth of his statement. The jury by its verdict obviously did not find Defendant's trial testimony credible. The jury also by its verdict credited the victim's testimony concerning the offense and the circumstances surrounding the offense, as was its prerogative. The victim's and Ms. Denney's explanations of why the offense was

not immediately reported to the authorities was for the jury to weigh in assessing the credibility of their testimony. It is well settled that "'[t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact.'" State v. Smith, 42 S.W.3d 101, 106 -107 (Tenn. Crim. App. 2000) (quoting State v. Cribbs, 967 S.W.2d 773, 793 (Tenn.1998)). A conviction based on the victim's testimony alone is sufficient. State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Moreover, corroboration of a victim's testimony by physical evidence, such as a medical report, is not required to support a jury's conviction of rape. State v. Bonds, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005).

Based on our review, we conclude that a rational trier of fact could find Defendant guilty of the offense of rape of a child beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## III. Motion to Suppress

At the hearing on Defendant's motion to suppress his statement, Investigator Kennamore testified that he interviewed Defendant after Defendant was arrested on the charge of rape of a child. Investigator Kennamore stated that he read the form containing the Miranda rights to Defendant. Defendant, Investigator Kennamore, and Investigator Billy Davis, who was also present during the interview, signed the form. Investigator Kennamore said that Defendant did not have any questions about his Miranda rights and appeared to understand those rights. Defendant was interviewed for a period of time and then Investigator Kennamore reduced his questions to writing and wrote down Defendant's responses to the written questions. At no point did Defendant indicate that he wished to terminate the interview or that he wanted the assistance of counsel. Investigator Kennamore stated that Defendant did not have his glasses with him. Officer Angela Anders read Defendant's statement to him and then signed the statement. Investigator Kennamore said that the interview commenced at 8:30 a.m. and lasted approximately one hour and forty-five minutes.

On cross-examination, Investigator Kennamore said that he received word on the evening of June 20, 2007, that Defendant had arrived at the Hardeman County Jail, and Defendant was interviewed the following day. Investigator Kennamore said that Defendant "appeared to be fine." Investigator Kennamore stated that the interview process was comprised of two components. Initially, Defendant was given the opportunity to talk and elaborate on his responses to the interview questions. Investigator Kennamore said that he then told Defendant, "Now, we're going to get your statement on paper," or words to that effect. Investigator Kennamore acknowledged that the interview was not recorded and that Defendant was not read his Miranda rights again before his responses were reduced to writing. Investigator Kennamore described Defendant as nervous "and probably a little upset" during the interview but said that Defendant did not appear to be confused.

Investigator Davis testified that Defendant was read his Miranda rights, that he appeared to understand his rights, and that he did not ask any questions about his rights or the interview process. Investigator Davis said that Defendant at no point asked to terminate the interview or invoked his

right to counsel. On cross-examination, Investigator Davis stated that he did not recollect asking Defendant about his level of education and described defendant as "nervous" during the interview.

Defendant testified that he was fifty-two years old and suffered from a "bad hip joint," depression, and a heart condition. Defendant said that his colon cancer was in remission. At the time of his arrest, Defendant was taking Loritab. Defendant stated that he "barely" remembered his interview with Investigator Kennamore and said that the interview was "kind of blurred like." Defendant said that he had taken approximately 30 Loritab on June 20, 2007, and drunk two forty-ounce bottles of beer. Defendant stated that he was nervous and "feeling shaky inside" the next morning when the interview began. Defendant said that he did not remember anything about the interview other than telling the investigating officers his name. Defendant stated that he did not understand that he had the right to refuse to talk to the investigators. Defendant recollected that a woman read something to him during the interview, but he did not understand what she was reading.

At the conclusion of the suppression hearing, the trial court denied Defendant's motion. The trial court credited the testimony of Investigators Kennamore and Davis, and found that Defendant's statement was knowingly and voluntarily given based on the totality of the circumstances.

On appeal, Defendant challenges the trial court's denial of his motion to suppress. Defendant submits that he was sick and nervous on the day of the interview and could not remember anything about the process. Defendant also points to his trial testimony that one of the investigators was "pretty much in his face," was "rough" with him, and threatened to "put his DNA on [the victim]." Defendant argues that these factors support a finding that his statement was not voluntarily made.

This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

"Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights." State v. Berry, 141 S.W.3d 549, 577 (Tenn. 2004) (citing Miranda v. Arizona, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992)). In determining the voluntariness of a statement, the trial court must look at the totality of the circumstances and decide if "the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined."

State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)).

Defendant contends that he did not understand his constitutional right to remain silent as a result of his ill health on the day of the interview, caused by the ingestion of thirty Loritabs and beer the day before. Investigator Kennamore testified that he was notified of Defendant's arrival at the Hardeman County Sheriff's Department on the evening of June 20, 2007, and Defendant was housed in the county jail until approximately 8:30 a.m. the following morning when the interview began. Investigator Kennamore and Investigator Davis agreed that Defendant appeared nervous during the interview, but both testified that Defendant understood his Miranda rights. Although Defendant described the interview process as a "blur," his statement is detailed and coherent as to the circumstances surrounding the commission of the offense. Even though Defendant repeatedly denied that he remembered anything that occurred during the interview, Defendant testified at trial concerning the investigating officers' demeanor which Defendant described as "rough" and threatening. Defendant also testified at trial that he knew that he was charged with rape of a child at the time of the interview.

The trial court found:

that the defendant's testimony was somewhat contradictory to the arresting officers; however, the Court does determine that, again the defendant did make a knowing and voluntary and intelligent waiver of the rights. The Court does accredit the testimony of the officers. The Court does not find the statement of the defendant that the matter was a blur to be a credible statement. The Court finds more credible that he was nervous and scared considering the charges against him and his situation. The Court finds that to be a reasonable situation.

Based on our review, we conclude that Defendant knowingly and voluntarily waived his constitutional right against self-incrimination and voluntarily gave his statement concerning the offense. Thus, the trial court did not err by denying Defendant's motion to suppress his statement. Defendant is not entitled to relief on this issue.

## IV. Sentencing

Defendant argues that the trial court erred in enhancing the length of his sentence based on a finding that Defendant abused a position of private trust "in a manner that significantly facilitated the commission or the fulfillment of the offense." See T.C.A. § 40-35-114(14). Defendant contends that there was no proof presented at trial that would support a finding of a special relationship between the victim and Defendant, or that Defendant "was anything other than a renter" in Ms. Denney's home.

At the sentencing hearing, the State relied upon the presentence report which was introduced as an exhibit without objection. Defendant offered no evidence at the hearing. According to the

presentence report, Defendant completed the sixth grade before dropping out of school. Defendant stated that he was separated from his wife, and he has three adult children. Defendant reported working as a salesman for an automobile dealership in Mississippi from 1991 until 2001 when he resigned due to health problems. Defendant stated in the report that he first used alcohol in 2004 and consumed a twelve-pack of beer daily. Defendant reported that "he was sober for six hours at a time and did not commit crimes when drunk." Defendant does not have a prior history of criminal convictions.

Defendant was convicted of rape of a child, a Class A felony. As a Range I, standard offender, Defendant was subject to a sentence range of between fifteen and twenty-five years. See T.C.A. § 40-35-112(a)(1). The trial court found the presence of one enhancement factor based on Defendant's violation of a private trust with the victim. The trial court sentenced Defendant as a Range I, standard offender, to eighteen years for his rape of a child conviction.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. See T.C.A. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. Carter, 254 S.W.3d at 345 (quoting State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); State v. Pierce, 138 S.W.3d 820, 827 (Tenn. 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." Carter, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the

the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

A defendant's abuse of a private trust "that significantly facilitated the commission or fulfillment of the offense" may be considered as an enhancement factor. See T.C.A. § 40-35-114(14). In State v. Kissenger, 922 S.W.2d 482, 488 (Tenn. 1996), our supreme court held that:

> [a]pplication of [this] factor requires a finding, first, that the defendant occupied a position of trust, either public or private. The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability or faith.

Ms. Denney testified that she first met Defendant in Mississippi. Defendant lived two doors down from Ms. Denney, and he befriended Ms. Denney's sons. When Ms. Denney decided to move to Tennessee, her sons asked Ms. Denney to let Defendant move in with them. Ms. Denney said that Defendant told her that her children "were like angels to him." Ms. Denney agreed to let Defendant stay at her house in exchange for Defendant's help in paying the family's bills. At trial, Defendant described his relationship with the Denney children as follows:

> I'd say like a father/daughter/son, you know, like a grandfather or something. I tried to be, you know – that's how I treated them, you know. I'm crazy about the whole family – I mean the whole family. I just love them to death you know.

"Where the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999). Based on our review, we conclude that the record supports the trial court's consideration of enhancement factor (14) in determining the length of Defendant's sentence. The record in this case adequately supports the trial court's decision to impose a sentence of eighteen years for Defendant's conviction of rape of a child. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE