# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 29, 2012 Session

## STATE OF TENNESSEE v. LARRY D. ROTHWELL

### Appeal from the Circuit Court for Rhea County
### No. 16994    J. Curtis Smith, Judge

_____

### No.  E2011-01733-CCA-R3-CD - Filed June 20, 2013

_____

Appellant, Larry D. Rothwell, was convicted by a Rhea County jury of second degree murder and sentenced to twenty-one years in incarceration.  After the denial of a motion for new trial, Appellant has presented the following issues for our review on appeal: (1) whether the trial court abused its discretion by excusing a juror; (2) whether the trial court abused its discretion by refusing to allow introduction of portions of a witness's pretrial interview; (3) whether the trial court improperly excluded evidence about how the fight between Appellant and the victim started, determining that evidence from Betty Lewis was collateral; (4) whether the trial court improperly refused to enforce a subpoena for Betty Lewis on behalf of Appellant; (5) whether the trial court improperly denied Appellant the opportunity to impeach Brandy Smith; (6) whether the trial court improperly allowed hearsay testimony; (7) whether the trial court improperly excluded Randy Rothwell's testimony about the description of a knife removed from the victim's body; (8) whether the trial court improperly declared Randy Rothwell a hostile witness; (9) whether the trial court improperly excluded evidence of Brandy Smith's prior felony conviction; (10) whether the trial court improperly denied the motion to suppress; (10) whether the evidence was sufficient to support the conviction; (11) whether cumulative errors of the trial court require reversal of the conviction; and (12) whether the sentence was excessive.  After a review of the record, we determine that the evidence did not preponderate against the denial of the motion to suppress where the evidence supported a finding of exigent circumstances; the trial court did not err in excusing a juror; the trial court properly excluded impeachment of Brandy Smith by prior inconsistent statement where she admitted to an inconsistency in one prior statement and the other statement was not inconsistent; the trial court properly determined that the testimony of Betty Lewis was excluded by the collateral fact rule; the trial court properly admitted the statements of Randy Rothwell; the trial court properly excluded the testimony of Leo Andy about the knife on the victim's person as hearsay; the trial court properly determined that Randy Rothwell was a hostile witness; the trial court did not abuse its discretion when it determined that the admission of Brandy Smith's prior conviction was more prejudicial than probative; the evidence was sufficient to support the lesser included offense of second degree

murder; and the trial court properly sentenced Appellant. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROGER A. PAGE, J., joined and THOMAS T. WOODALL , J., Concurring in Results.

M. Keith Davis, Dunlap, Tennessee, for the appellant, Larry D. Rothwell.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

In April of 2008, Appellant was indicted by the Rhea County Grand Jury for the first degree murder of Joseph B. Shirley. The shooting that gave rise to the indictment and the victim's death occurred on December 2, 2007, at a mobile home that Appellant shared with his brother Randy Rothwell.[1] The mobile home was actually owned by their sister, Judy McMillen.

### *Motion to Suppress*

Prior to trial, Appellant filed a motion to suppress. In the motion, Appellant argued that there was no consent to search form secured prior to a search of the residence and that there were no exigent circumstances that justified a warrantless search of his residence. The trial court held a lengthy hearing on the motion.

For about eight years prior to the incident, Appellant had a relationship with Brandy Smith. They dated on and off during this time period. Ms. Smith moved in with Appellant and his brother in February or March of 2007, but the relationship between Ms. Smith and Appellant ended in October or November of that year. When Ms. Smith and Appellant broke up, Ms. Smith started dating Mr. Shirley.

---

[1]For the sake of clarity, we will refer to Randy Rothwell as "Mr. Rothwell" throughout the opinion and refer to Larry Rothwell as "Appellant."

At the hearing, Officer Matt Rose of the Rhea County Sheriff's Department testified that he responded to a call informing him that two people were fighting over a gun at 2438 Blythe Ferry Road. He arrived at the residence about five minutes after he received the call.

When Officer Rose arrived on the scene, he parked and exited his vehicle. He took his rifle out of his vehicle and took cover behind the vehicle because he had been notified by dispatch that there had been an actual shooting. As he exited the car, he saw Appellant's brother standing on the porch and heard a woman, later identified as Ms. Smith, screaming, "He's killed my boyfriend."

Officer Rose called for backup, notifying dispatch of the situation at the mobile home. He held Mr. Rothwell and Ms. Smith in place until help arrived from the Dayton Police Department. When backup arrived, Officer Rose secured Ms. Smith by handcuffing her and moving her out of the line of fire. Ms. Smith informed Officer Rose that her boyfriend was "on the other side of the car [that was in the driveway]." Ms. Smith was covered with blood. Officer Rose could not ascertain at that time if she was bleeding or cut. Ms. Smith informed officers that Appellant shot her boyfriend. The officers saw the victim lying on the ground on his back on the other side of the car that was parked in the driveway. The victim's body was partially underneath the vehicle. It was obvious to Officer Rose that the victim had suffered a gunshot wound to the abdomen and was dead.

As the situation developed, it became clear that Appellant was inside the residence. The SWAT team arrived on the scene. Detective Chris Hall, the SWAT team commander, talked to Appellant through a bullhorn and ordered him to come out of the residence. Appellant exited the mobile home about fifteen minutes later and sat on the steps of the porch. He was unarmed.

Appellant was arrested and the rest of the team entered the home to check for other suspects or victims who might be inside the residence. During the sweep of the home, Officer Rose saw a 12-gauge shotgun lying in the middle of the floor in one of the bedrooms as well as a rifle sticking out from behind the bed. Officer Rose testified that both of the guns were in plain view. The guns were left undisturbed at that time.

A storm was approaching the area at the time the officers were arriving on the scene. Detective Hall became concerned that evidence would be lost if it started to rain so he began photographing and collecting evidence outside. Detective Hall went inside the trailer after being told that there was a shotgun lying in the middle of the floor. Detective Hall retrieved the shotgun from the floor, as well as a bloody envelope from a coffee table. Both items were in plain view and he did not move anything to retrieve them from the mobile home. No one received consent to search the home prior to the search.

At the conclusion of the hearing on the motion to suppress, the trial court determined that Appellant had a reasonable expectation of privacy in the residence and, therefore, had standing to challenge the search of the residence. However, the trial court ruled that the "initial warrantless search of the residence for other victims or suspects was reasonable and pursuant to exigent circumstances." Further, Detective Hall's search of the residence was a continuation of the original entry. The trial court concluded the items that were seized were in plain view, and the detective had probable cause to believe that they were evidence of a crime and subject to seizure. In other words, the trial court denied the motion to suppress.

*Proof at Trial*

At trial, Ms. Smith offered conflicting testimony about whether the victim was her boyfriend. However, she testified that the night prior to the incident she was at the victim's grandmother's house with the victim. Mr. Rothwell picked them up and brought them to the mobile home. Appellant was already at the home. They played cards and drank beer. Mr. Rothwell did not drink that night. He was taking medication for schizophrenia and did not feel well.

Ms. Smith claimed that the victim did not drink any beer and that she drank one or two beers. According to Ms. Smith, Appellant became intoxicated and asked her for sex. Ms. Smith turned Appellant down; Appellant got upset and went into the bedroom.

Appellant claimed that the argument started because the victim asked Appellant if he and Ms. Smith could move into the mobile home because his grandmother kicked them out. Mr. Rothwell's testimony corroborated Appellant's version of the origin of the argument. Mr. Rothwell testified that Ms. Smith hit Appellant in the head with a toy gun because Appellant told Ms. Smith that she and the victim could not move into the mobile home. Mr. Rothwell testified that Appellant and the victim were joking around about "sharing" Ms. Smith with each other when Ms. Smith hit Appellant in the head with the toy gun. Mr. Rothwell testified that after Ms. Smith hit Appellant, Appellant asked them to leave.

Ms. Smith claimed that after the argument started, she followed Appellant into the bedroom to talk to him. When she saw him getting the shotgun she knew it was time to leave. Ms. Smith called her brother to come and pick her up from Appellant's house. Ms. Smith and the victim waited outside. Ms. Smith was grabbed by the hair by Appellant as she walked out of the door. Ms. Smith testified that she was choked by Appellant. Ms. Smith also claimed that Appellant grabbed a tomato stick from the back of his truck and swung at the victim. The victim was able to dodge the stick and grab Appellant by the back of the

head. At that time, the victim rubbed Appellant's face in the gravel. Appellant got up, went inside, and retrieved the gun.

Mr. Rothwell claimed that when Appellant came back into the house, he looked as if he had been beaten up and claimed that the victim and Ms. Smith were trying to kill him. Mr. Rothwell heard two shots when Appellant went outside. He described Appellant as "crying and beat up pretty bad." He had "[b]lood running out of his ears." Mr. Rothwell was questioned about discrepancies between his trial testimony and his statements to officers immediately after the shooting at this point. The trial court declared Mr. Rothwell a hostile witness.

When Appellant came back outside, he shot the victim from the back in the right shoulder area. The victim started running around the car that was parked outside, trying to get away from Appellant. Appellant chased him. Ms. Smith tried to get Appellant to put the gun down and even tried to take the gun away from Appellant, but he hit her in the left temple with the gun.

Ms. Smith testified that the victim was begging Appellant not to shoot him again. Ms. Smith testified that Mr. Rothwell also begged Appellant to "stop, stop." Appellant shot the victim for a second time. This shot knocked the victim to the ground and onto his back. Ms. Smith ran to the victim and told him goodbye before running into the house to call 911. Ms. Smith hung up the phone and ran outside to hide in the bushes.

Bethany Smith happened to be driving by the area at the time of the incident. She saw a man holding a gun who was chasing another man. Melanie Garrison and her husband also drove past the area at the time of the incident. Mrs. Garrison likewise saw a man holding a rifle or shotgun running towards someone who was hiding behind a car. Mrs. Garrison saw a third person struggling with the gunman. It looked like the third person was trying to stop the gunman.

Deputy Rose testified consistently with his testimony at the hearing on the motion to suppress. When he arrived on the scene he saw Mr. Rothwell standing on the porch. Deputy Rose heard Ms. Smith scream that her "boyfriend" had been killed. Deputy Rose called for backup, secured Ms. Smith, and ordered Mr. Rothwell to come off the porch. After Deputy Rose secured Ms. Smith and Mr. Rothwell, he noticed the victim lying on the ground next to the car. Detective Hall arrived shortly thereafter and ordered Appellant to come out of the mobile home. Appellant eventually came out without a weapon. Deputy Rose moved in to sweep the home to make sure that there were no more suspects inside. When he entered one of the bedrooms, he saw a pump action shotgun lying on the bedroom floor and another gun

sticking out from behind the bed. Appellant was taken to jail. At the time of his arrest, Appellant had a cut over one of his eyes as well as bruising to the left shoulder and back.

As relayed in the hearing on the motion to suppress, officers searched the home shortly after Appellant's arrest. They collected three spent shotgun shells and a shotgun in addition to photographs of the scene and other evidence. According to officers on the scene, the victim was not wearing a shirt, but a shirt was lying on the ground about ten to fifteen feet away from the porch.

The medical examiner testified that the victim received a shotgun wound to the right arm and a shotgun wound to the left side of the body. The first shot from the gun was fired at a distance of five to nine feet from the victim. The medical examiner opined that the victim could have possibly survived the injury had he only received the shot to the arm. The second shot was a close range shot, fired at a distance of two to three feet from the victim. It ruptured the spleen and the kidney. The shot embedded in the victim's spine.

Appellant presented several witnesses at trial. Leo Leonard Andy, a private investigator, testified that he interviewed Ms. Smith twice prior to trial. According to Mr. Andy, Ms. Smith gave conflicting stories about the incident. On one occasion, she testified that Appellant swung at the victim with a stick. On another occasion, she claimed that Appellant swung at the victim with his fist. On cross-examination, Mr. Andy admitted that he did not let Ms. Smith review her statements to police prior to the interview.

Appellant took the stand to tell his version of the events that took place on December 2, 2007. According to Appellant, he was in his bedroom watching television when Ms. Smith and the victim came to the house and started drinking. Appellant recalled Ms. Smith's telling him that the victim's grandmother did not want them to live at her house. Appellant informed Ms. Smith and the victim that they could not stay at his house. According to Appellant, Ms. Smith got angry. The victim even waved a long knife at Appellant several times. The victim also had a hunting knife and sheath on his side.

Appellant testified that Ms. Smith hit him in the head with a toy gun. After this occurred, Appellant asked Ms. Smith and the victim to leave. Appellant stated that Ms. Smith pushed him, and the victim started beating him and kicking him. Appellant claimed that the victim was going to kill him and cut his throat. Appellant testified that he suffered broken ribs and was running for his life. Appellant stated that the victim pulled out his knife to "finish him off," when Appellant ran inside his trailer and retrieved his shotgun. Appellant testified that he told the victim to leave, but the victim took a step toward him. Appellant testified that, at that time, he started firing. Appellant admitted that he did not see the victim with a knife when he came back outside.

At the conclusion of the jury trial, the jury found Appellant guilty of the lesser included offense of second degree murder. The trial court sentenced Appellant to twenty-one years in incarceration. After the denial of a motion for new trial, Appellant filed a timely notice of appeal.

*Analysis*

*Motion to Suppress*

On appeal, Appellant argues that the trial court improperly denied the motion to suppress the warrantless search of the mobile home. Specifically, Appellant insists that there were no exigent circumstances that supported the search. Further, Appellant argues that because there were no exigent circumstances, any and all evidence seized that was in plain view was improperly seized and should have been suppressed by the trial court. The State disagrees.

"This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise." *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions, and the trial court's findings of fact are subject to de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). Further, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). The question presented by the Appellant in this case is one of law. Therefore, there is no presumption of correctness with regard to the trial court's decision. *Walton*, 41 S.W.3d at 81.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and

seizures by government agents. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *Keith*, 978 S.W.2d at 865 (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967)). The Tennessee Supreme Court has noted previously that "[a]rticle I, [section] 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment [of the United States Constitution]," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968).

Under both the state and federal constitutions, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)); *see also State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003).

The most common exceptions to the requirement for a search warrant are: (1) consent to search; (2) a search incident to a lawful arrest; (3) probable cause to search with exigent circumstances; (4) in hot pursuit; (5) a stop and frisk situation; and (6) plain view. *See State v. Bartram*, 925 S.W.2d 227, 230 n.2 (Tenn. 1996). "If the circumstances of a challenged search and seizure come within one of the recognized exceptions, the fruits of that search and seizure are not subject to operation of the exclusionary rule and may be properly admitted into evidence." *State v. Shaw*, 603 S.W.2d 741, 743 (Tenn. Crim. App. 1980).

The Tennessee Supreme Court discussed the exigent circumstances exception to the warrant requirement in *State v. Meeks*, 262 S.W.3d 710 (Tenn. 2008). In *Meeks*, the court stated:

> Exigent circumstances arise where "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. at 403, 126 S. Ct. 1943 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). Given the importance of the warrant requirement in safeguarding against unreasonable searches and seizures, a circumstance will be sufficiently exigent only where the State has shown that the search is imperative. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State v. Hayes*, 188 S.W.3d at 514; *State v. Yeargan*, 958 S.W.2d 626, 641 (Tenn. 1997) (Reid, J., concurring). Although not an exclusive list, the following are frequently-arising situations that have been found to be sufficiently exigent to render a warrantless search of a

domicile reasonable: (1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury. *Brigham City, Utah v. Stuart*, 547 U.S. at 403, 126 S. Ct. 1943; *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005).

Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant. Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry. Mere speculation is inadequate; rather, the State must rely upon specific and articuable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

*Meeks*, 262 S.W.3d at 723-24 (footnotes omitted).

Appellant argues that the entry into the residence was unlawful and, therefore, the evidence that was seized was seized inappropriately. First, we must determine if the warrantless entry to the home based on exigent circumstances was proper. The facts from the hearing on the motion to suppress revealed that Officer Rose was the first officer on the scene after getting a call that people were arguing over a gun. Before he arrived on the scene, he had a report that someone was shot. When Officer Rose arrived on the scene he saw Mr. Rothwell on the porch and a woman screaming that someone had killed her boyfriend. Several other officers arrived moments later and secured the screaming woman and Mr. Rothwell. By that time, officers were aware that the victim's body was lying partially under the car. The officers set up a perimeter and learned that Appellant was still

inside the residence. They tried to coax him out for about ten to fifteen minutes before he came out. Officer Rose entered the residence at that time in order to check for other suspects or victims. We believe that under the circumstances Officer Rose had "an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *Meeks*, 262 S.W.3d at 724. The evidence does not preponderate against the trial court's ruling that this was the case.

Because we have determined that the initial warrantless entry into the residence was justified based on exigent circumstances, we must now determine whether the guns seized during the second entry into the home fell under the plain view doctrine. Under the plain view doctrine, three requirements must be met to justify a warrantless search and seizure of property: (1) the items seized must be in plain view; (2) the initial intrusion that enables the police to view the items seized must be lawful; and (3) the incriminating nature of the items seized must be readily apparent. *See State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Based on Deputy Rose's testimony, accredited by the trial court, the shotguns were in plain view in the bedroom, and there was a report that someone had been shot and killed by Appellant with a shotgun. We have previously determined that the "initial intrusion" - i.e. the entry into the residence to secure the premises and check for additional victims or perpetrators - was lawful. Thus, the requirements for a plain view seizure have been met. Therefore, Appellant's argument is without merit.

*Discharge of Juror Beach*

Next, Appellant complains that the trial court committed reversible error by excusing a sworn juror sua sponte when both parties agreed to allow the juror to remain on the jury after it was discovered that the juror was not living in Rhea County at the time of the trial. The State counters that Appellant is not entitled to relief because he did not object to the dismissal of the juror at trial and cannot show that plain error review is warranted on appeal.

At the conclusion of the first day of trial, the bus driver who transported jurors informed the trial court that Juror Beach may not be a resident of Rhea County. During a voir dire, Juror Beach informed the trial court that he was living in Roane County while he was renovating his home in Rhea County. At the time, he had been living in Roane County for two months and was not certain when he would return to his house in Rhea County. The trial court reserved a ruling on the matter. However, the next day, the trial court excused Juror Beach in order to "eliminate any issue [about what county Juror Beach resided in at the time of trial]." Counsel for Appellant informed the trial court that he understood if he did not raise the issue now that he could not raise it "down the road." Counsel for Appellant indicated to the trial court that he was "fine with Mr. Beach [being on the jury]." Despite

-10-

both parties acquiescing to Juror Beach remaining on the jury, the trial court chose to dismiss the juror, leaving a jury of twelve for Appellant's trial.

The State argues on appeal that Appellant failed to make a contemporaneous objection and has, therefore, waived the issue. We disagree. We interpret the statements of counsel for Appellant as an objection. At this point in the trial, the trial court could dismiss a juror for cause. T.C.A. § 22-1-105; Tenn. R. Crim. P. 24(c). The trial court in this case chose to dismiss the juror and did not replace the juror with another prospective juror; rather, the trial court decided to proceed to trial with twelve, instead of thirteen, jurors.[2] *See State v. David Lee Richards*, No. 03C01-9207-CR-230, 1993 WL 80536, at *2 (Tenn. Crim. App., at Knoxville, Mar. 23, 1993) (holding that the trial court did not abuse its discretion in proceeding with thirteen, rather than fourteen, jurors), *perm. app. denied* (Tenn. July 6, 1993); *see also State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991) (holding that the decision to discharge a juror and to select an alternate juror is left to the discretion of the trial court). As it turned out, an alternate juror was neither used nor needed, causing no prejudice in that respect. *See State v. Max*, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986) (holding that in order to challenge the trial court's decision to seat an alternate juror a defendant has burden of demonstrating how he or she was prejudiced by that action). Further, Appellant herein has not shown that the jury that heard his case was not fair or impartial. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The juror was excused prior to deliberation. Appellant was convicted by a jury of twelve. Appellant is not entitled to relief on this issue.

### *Evidentiary Issues*

Appellant raises several evidentiary issues for our review. Generally, we review issues regarding the admissibility of evidence under an abuse of discretion standard. *State v. Looper*, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (citing *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). Thus, the trial court's decision will remain intact unless the reviewing court determines that the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). An abuse of discretion will only be found "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)); *see also Looper*, 118 S.W.3d at 422.

---

[2]Another juror, Sarah K. Lewis, was dismissed prior to testimony after the court officer informed the trial court that Juror Lewis had some concerns about serving on the jury and the trial court's personal observation that she looked "stressed."

### A. Impeachment of Ms. Smith

First, Appellant argues that the trial court abused its discretion when "it refused to allow counsel [for Appellant] to introduce portions of Brandy Smith's recorded pre-trial interview." Specifically, Appellant claims that Ms. Smith testified to "two facts which were contrary to what she had previously stated in her recorded interview" and, as a result, Appellant should have been allowed to introduce Ms. Smith's pretrial interviews to impeach her testimony. Appellant points to Rule 613(b) and Rule 803(26) of the Tennessee Rules of Evidence to support his argument on appeal. The State, on the other hand, insists that counsel for Appellant did not "lay a proper foundation before attempting to introduce the extrinsic evidence" as set forth in Rule 613(b). Additionally, the State insists that the evidence was not admissible as substantive evidence because it did not meet the requirements of Rule 613(b) and Ms. Smith admitted that she made the statements so "[t]he admission made any extrinsic evidence both cumulative and consistent with the statement made by the witness during trial." Finally, the State submits that any error was harmless.

Approximately two weeks prior to trial, counsel for Appellant conducted two separate interviews of Ms. Smith. One of these interviews was at the home of Ms. Smith's grandmother. The second interview was over the telephone. Both of the interviews were recorded.

At trial, Ms. Smith testified for the State as the key eyewitness to the shooting. Appellant complains on appeal about two separate facts that Ms. Smith related at trial. First, Ms. Smith testified at trial that during the incident Appellant grabbed a tomato stick and swung it at the victim before the victim dodged it, grabbed Appellant, and rubbed Appellant's face in the dirt. On cross-examination, Ms. Smith admitted that she told counsel for Appellant during an interview that Appellant tried to hit the victim with his fist, not a stick. Secondly, Appellant complains about Ms. Smith's testimony on direct examination that the victim was not walking toward Appellant when he was fatally shot but was walking "in front of the car" and "around towards the front of the hood of the car." During the interview, Ms. Smith testified that the victim moved toward Appellant before Appellant shot him.[3] During Ms. Smith's testimony, the trial court instructed the jury that it could consider only the testimony at trial as proof and any inconsistencies in prior testimony would be relevant only to the issue of credibility of the witness.

With regard to the first of Ms. Smith's statements, during Appellant's case in chief Appellant introduced the testimony of investigator Leo Andy to impeach the testimony of Ms. Smith. Mr. Andy participated in the pretrial interviews of Ms. Smith. As part of Mr.

---

[3]Appellant insists that this is an important fact based on Appellant's theory of self-defense.

Andy's testimony, counsel for Appellant attempted to play a portion of the recorded interview and introduce it into evidence. The State objected. The trial court did not allow the interviews to be introduced but allowed Mr. Andy to refresh his recollection by listening to the tape during a jury-out session and then testify regarding the discrepancy between Ms. Smith's trial testimony and her statements during the interviews. Mr. Andy testified as follows:

> [COUNSEL FOR APPELLANT]: Let me ask you, when we met with [Ms. Smith] at her grandmother's did she mention anything about [Appellant] swing[ing] at [the victim] with a stick?
>
> [MR. ANDY]: I believe she did on the first interview.

Mr. Andy could not remember what Ms. Smith stated in the second interview. After he reviewed the tape, he testified that Ms. Smith claimed Appellant "came down the stairs and swung, not with a stick, swung at [the victim]."

In our view, this matter is governed by Tennessee Rule of Evidence 613, which sets out the procedure for utilizing the prior statement of a witness for impeachment purposes, and Tennessee Rule of Evidence 803(26), which lists exceptions to the rule forbidding hearsay testimony. Impeachment evidence, like any evidence, must be relevant in order to be admitted into evidence. *State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004).

The rules of evidence limit the introduction into evidence of prior inconsistent statements of witnesses. Tennessee Rule of Evidence 613(b) provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

*See also State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 613(b) allows the introduction of otherwise inadmissible extrinsic evidence for impeachment. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998); *see also State v. Smith*, 24 S.W.3d 274, 280-81 (Tenn. 2000). A prior inconsistent statement introduced for purposes of

impeachment may be considered only on the issue of credibility and not as substantive evidence. *Reece*, 637 S.W.2d at 861. When presented with a prior inconsistent statement a "witness has several possible responses: the witness can admit, deny, or not remember making all or part of the statements." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 613[5][a] (5th ed. 2005). If the witness admits making the prior inconsistent statement, *any extrinsic proof of the statement would be cumulative and therefore inadmissible. Id.*

Analyzing the situation herein in the context of Rule 613, we note that in the case herein, Ms. Smith admitted to the inconsistency on cross-examination. This inconsistency was bolstered by the testimony of Mr. Andy. As a result of Ms. Smith's admission of the inconsistency, any further extrinsic evidence of the prior inconsistent statement would be inadmissible. *Martin*, 964 S.W.2d at 567. Even without the admission of the recording of the interview, the jury heard about the discrepancy both from Ms. Smith and Mr. Andy. The trial court did not err in refusing to allow Appellant to introduce the prior statement itself. Appellant is not entitled to relief with respect to this issue.

With regard to the second statement, in our opinion, it was not an inconsistent statement. Ms. Smith told Mr. Andy during the interview that the victim was walking toward the front of the car when he was shot for the second time by Appellant. At trial, Ms. Smith testified that the victim was "walking in front of the car talking to [Appellant], . . . not toward him. He was walking around towards the front of the hood of the car." From the pictures taken of the scene that were introduced at trial, it appears that the car to which Ms. Smith referred was situated in the front of the residence. At the time the shot was fired, Appellant was allegedly in an area in between the residence and the car and a truck that was also in the front of the residence. Ms. Smith was never questioned about the discrepancy in the testimony as required by Rule 613(b). Tenn. R. Evid. 613(b) ("[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible *unless and until the witness is afforded an opportunity to explain or deny the same* and the opposite party is afforded an opportunity to interrogate the witness thereon . . . .") (emphasis added). Therefore, a proper foundation for admission of a prior inconsistent statement was not laid.

Appellant also argues that the recorded statements should have been introduced as substantive evidence as an exception to the hearsay rule. Analyzing the statements under 803(26) as an exception to hearsay, we reach the same result. Tennessee Rule of Evidence 803(26) provides:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26).

The Advisory Commission Comments to the rule state:

> To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.
>
> . . . .
>
> The rule requires that the party seeking to have the statement treated as substantive evidence request a hearing out of the presence of the jury to satisfy the judge "by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness."

Tenn. R. Evid. 803(26) (Advisory Comm'n Cmts.).

In the case herein, as we concluded above, only the first statement of which Appellant complained, about the stick versus the fist, was even admissible under Rule 613(b). Appellant did not request and the trial court did not conduct a jury out hearing to determine by a preponderance of the evidence that the statement was trustworthy. Appellant did not request such a hearing. Therefore, we cannot say that the trial court erred in refusing to admit the statement as substantive evidence. Moreover, as noted earlier, the second statement was not admissible under Rule 613(b) and, therefore, not admissible as substantive evidence under Rule 803(26). Thus, we conclude that the trial court did not abuse its discretion in refusing to admit the statements made by Ms. Smith prior to trial.

## B. Evidence About How the Incident Started

Next, Appellant complains that the trial court erred by refusing to allow Appellant to introduce evidence from Betty Lewis, Ms. Shirley's grandmother, about why Ms. Smith and the victim were not living at her home. Appellant insisted that this testimony gave credence to Appellant's theory that the incident stated when Ms. Smith got upset because Appellant would not let her and the victim move into his residence. Moreover, it contradicted and impeached Ms. Smith's testimony that the fight between Appellant and the victim started over Ms. Smith's refusal to have sex with Appellant. Specifically, Appellant suggests that the trial court improperly ruled the evidence was "collateral." As a result, Appellant insists that he was unable to present a defense.

At trial, the State's theory was that Appellant was the aggressor, starting the fight with Ms. Smith and the victim when Ms. Smith refused Appellant's request for sex. Appellant, on the other hand, tried to show that he was not the initial aggressor by testimony from himself and his brother that the fight started when Appellant refused to let Ms. Smith and the victim move into the residence. To support his theory, Appellant tried to introduce the testimony of Ms. Lewis, who would testify that she would not let Ms. Smith live in her home with her boyfriend, the victim. The State objected, arguing that any reason as to why Ms. Smith and the victim were not living at Ms. Lewis's house was not relevant and was a collateral issue. Appellant argued that the jury was entitled to know what the argument was about. The trial court determined that the issue was not relevant and, in fact, was collateral to the real issue at bar.

Impeachment of a witness through fact contradiction is subject to the collateral evidence rule. *State v. Perkinson*, 867 S.W.2d 1, 6 (Tenn. Crim. App. 1992). In other words, with respect to whether Ms. Lewis's testimony was inadmissible as relating to a collateral fact, the general rule is that "the statement of a witness made during cross-examination as to a collateral fact may not be impeached by extrinsic evidence of a prior inconsistent statement as to that fact." *State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004). "According to this rule, there can be no extrinsic proof of collateral matters[,] . . . [and] counsel must accept the witness' response, even if it is a denial that counsel could disprove." *Id.* (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.07[4][b] (5th ed. 2005)). A collateral fact is one which has no relevance except that it contradicts something said in court, and a fact is not collateral "if it is relevant independent of any contradiction." *Id.* at § 6.07[4][c]. The purpose of this rule is to prevent the extensive strain on judicial resources that would inevitably occur if every fact, no matter how trivial, in a witness' testimony could be controverted through extrinsic evidence. A fact is not collateral if it provides a reasonable inference concerning the principal matters in dispute. *See id.*

In this case, Ms. Lewis's proposed testimony about the fact that she would not permit Ms. Smith and the victim to live in her home did not go straight to the heart of the principle

matter of dispute. While there was a dispute as to how the argument started, i.e. Ms. Smith testified it started after she refused to have sex with Appellant, and Appellant and Mr. Rothwell testified it started after Appellant refused to let Ms. Smith and the victim move in with him, it is irrelevant why Ms. Smith and the victim were not living somewhere else. In other words, this was a collateral fact. This fact was not of crucial significance to a jury's determination of whether or not the crime alleged in the indictment occurred. Because the witness's statement did not "relate to facts relevant to a material issue at trial," *id.*, the trial court did not err by failing to exclude Ms. Lewis's testimony on grounds that it pertained to a collateral fact. Related to this issue, Appellant complains that the trial court erred by refusing to enforce a subpoena for Ms. Lewis to testify. Because we have determined that the trial court did not err in excluding this testimony, this issue is moot.

## C. Excited Utterance

Appellant argues next on appeal that the trial court abused its discretion by allowing Ms. Smith to testify as to statements made by Mr. Rothwell in which he told Appellant to "stop [pursuing the victim]." Appellant insists that this statement was not an excited utterance and does not fit within any of the recognized hearsay exceptions. The State argues that the trial court properly determined that the statement was an excited utterance.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). For a hearsay statement to be admissible, it must fall within the hearsay exceptions provided at Rule 803 of the Tennessee Rules of Evidence.

One of the long-recognized exceptions to the hearsay rule is the excited utterance exception found at Rule 803(2) of the Tennessee Rules of Evidence. This exception applies to statements, "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *State v. Land*, 34 S.W.3d 516 (Tenn. Crim. App. 2000), this Court stated that "[t]he underlying theory of this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." 34 S.W.3d at 528. For a statement to fall within this exception, three criteria must be met: (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement. *Id.* at 528-29 (citing Neil P. Cohen, et. al., *Tennessee Law of Evidence* § 803(2).2 at 533-34 (3d ed. 1995)). Appellate review of hearsay issues is guided by the de novo standard of review. *See State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App.

2007) ("[A] trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness.")

In the case herein, Appellant complains about Ms. Smith's testimony regarding statements made by Mr. Rothwell during the incident while Mr. Rothwell was standing on the porch and Appellant was in the front of the residence with the gun. The statement occurred after Appellant had fired the gun and shot Appellant. According to Ms. Smith, Mr. Rothwell was telling Appellant to "please stop, stop. Trying to get his brother to stop, don't do it."

Mr. Rothwell's instructions or orders to his brother to "stop" were not hearsay since the truth of their content is irrelevant. *See* Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* 8.01[10] (5th ed. 2005). However, no objection to the relevance of these orders was interposed thus the issue is waived. Tenn. R. App. P. 36(a).

### D. Description of the Knife on the Victim's Person

Appellant argues that the trial court improperly prohibited Mr. Andy from testifying that Mr. Rothwell was able to give an accurate description of a knife that was removed from the victim's pocket prior to the autopsy. Appellant argues that this testimony was necessary to corroborate the testimony of Mr. Rothwell, who had already described the knife in his own testimony and claimed that the victim had the knife out during the altercation. The State contends that the evidence was properly excluded as hearsay and Appellant has not shown that the statement fits any hearsay exception.

During Mr. Rothwell's testimony on cross-examination, he stated that the victim had a knife in his pocket and was "flicking it open" on the day of the incident. Later, during the testimony of Mr. Andy, counsel for Appellant asked if there were allegations in the case about a "foldout knife" that the victim was in possession of at the time of his death. Mr. Andy commented that the knife was first made available to the defense on the Friday prior to trial. However, Mr. Andy started to testify that he had been given a description of that knife by Mr. Rothwell before the defense team had any information about the knife. The trial court excluded this testimony as hearsay.

Again, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). For a hearsay statement to be admissible, it must fall within the hearsay exceptions provided at Rule 803 of the Tennessee Rules of Evidence. Reviewing this issue de novo, we determine that the trial court properly excluded the testimony of Mr. Andy as hearsay and it does not fit within any exception to the hearsay rule. Further, the jury had

already heard from Mr. Rothwell himself that the victim had a knife. Moreover, Appellant's testimony was corroborated by one of the witnesses for the State, a detective that testified that a knife was found on the victim's side in a sheath and one other knife of a "folding type" was found in the pocket of the victim's shorts at the autopsy. This issue is without merit.

### E. Declaration of Mr. Rothwell as a Hostile Witness

Appellant argues that the trial court erred when it declared Mr. Rothwell as a hostile witness. Specifically, Appellant insists that the trial court's declaration of Mr. Rothwell as "hostile" in front of the jury was "improper and had an impact on the jury's opinion" of his testimony. Appellant admits that the comment itself was not error that rises to the level of granting a new trial but that in the overall context of the case, the statement was error. The State disagrees.

"[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993). However, Tennessee Rule of Evidence 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop . . . testimony . . . . When a party calls a hostile witness . . . interrogation may be by leading questions." The declaration of a witness as a hostile witness most usually "occurs when the party calling the witness is surprised by the witness' trial testimony and it is contradictory to the witness' pretrial statements." Tenn. R. Evid. 611(c); *see also State v. James Alfonso Vaughn, a/k/a Fuzz*, No. 01C01-9612-CR-00523, 1998 WL 255438, at *6 (Tenn. Crim. App., at Nashville, May 21, 1998), *perm. app. denied*, (Tenn. Jan. 25, 1999) (citing *Floyd v. State*, 596 S.W.2d 836, 839 (Tenn. Crim. App. 1979); *State v. Darrell Fritts*, No. 132, 1992 WL 236152 (Tenn. Crim. App., at Knoxville, Sept. 25, 1992)). The trial court uses its discretion to decide whether to allow the use of leading questions on direct examination, and its decision will not be reversed absent an abuse of that discretion. *Kong C. Bounnam v. State*, No. W2001-02603-CCA-R3-PC, 2002 WL 31852865, at *9 (Tenn. Crim. App., at Jackson, Dec. 20, 2002), *perm. app. denied*, (Tenn. May 27, 2003) (citing *Mothershed v. State*, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978)).

In the case herein, during Mr. Rothwell's testimony on direct examination, he was questioned by the prosecutor about inconsistencies between his pretrial statement and his testimony at trial. Mr. Rothwell claimed that the detective had "mixed up" some of the things he said. Mr. Rothwell told counsel for the State that he did "not necessarily" want to read his statement. Not long thereafter, counsel for Appellant objected to a leading question, and the trial court officially declared Mr. Rothwell to be a hostile witness. The record shows that Mr. Rothwell's testimony on the witness stand was markedly different than that in his statement and that the State was taken by surprise by his changed testimony. Under these

circumstances we cannot conclude that the trial court abused its discretion in allowing the State to use leading questions in its direct examination. Additionally, to the extent Appellant is arguing that the trial court erred in declaring Mr. Rothwell to be a hostile witness, Appellant has waived this issue for failure to object at trial to this declaration by the trial court. Tenn. R. App. P. 36(a).

### F. Admission of Prior Conviction for Impeachment

Appellant insists that the trial court erred by refusing to allow him to question Ms. Smith about a prior felony conviction for criminally negligent homicide. Specifically, Appellant argues that although the trial court properly conducted a balancing test pursuant to Tennessee Rules of Evidence 609 and 403, the court came to the wrong conclusion because witness credibility was such an important issue in the case.

Rule 609 of the Tennessee Rules of Evidence states that the credibility of a witness may be attacked by evidence of prior convictions if certain prerequisites are met. First, the conviction must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Next, if the "witness to be impeached is the accused in a criminal prosecution" upon request, the court must determine that the probative value of the prior conviction on the issue of credibility outweighs its prejudicial effect on substantive issues. Tenn. R. Evid. 609(a)(3). Rule 609(b) also requires that the convictions have been within the ten years previous to a defendant's current charge. "For witnesses not covered by 609(a)(3), the balancing test is different. Rule 403 applies, and a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice' or other criteria listed in that rule." Tenn. R. Evid. 609, Advisory Comm'n Cmts.

Appellant specifically argues that the trial court erred in refusing to allow him to impeach the testimony of Ms. Smith with a prior conviction for criminally negligent homicide. The State insists that the issue is waived for failure of Appellant's brief to properly cite to the record per Tennessee Rule of Appellate Procedure 27(a)(7) and Tennessee Court of Criminal Appeals Rule 10(b). While Appellant's brief does not cite to the record, we will address the issue nonetheless because it is clear from the record that Appellant attempted to question Ms. Smith about her prior conviction. The trial court held a jury-out hearing on the matter before making a ruling that the prior conviction was inadmissible because it was more prejudicial than probative and was not probative of truthfulness. The trial court performed the proper balancing test under Rule 403. We conclude that the trial court did not abuse its discretion in ruling that the conviction was inadmissible for impeachment purposes.

Appellant argues that the evidence is insufficient to support the conviction for second degree murder. Specifically, he contends that "the evidence presented at trial was not sufficient to convict [Appellant] of any crime, but, rather, supports his claim that he was acting in self-defense" or that the evidence at most supported a conviction of voluntary manslaughter because his actions were produced by adequate provocation. The State insists that the evidence was sufficient.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994) (citing *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992)). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. T.C.A. §§ 39-13-201, -210(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act, and from all the circumstances of the case in evidence.

*State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Because second degree murder is a "result-of-conduct" offense, a defendant is guilty if he "acts intentionally, meaning that he acted with a conscious objective or desire to cause the death of the alleged victim." *State v. Page*, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002).

The proof at trial, in a light most favorable to the State, indicated that Appellant and the victim became engaged in an altercation after a disagreement, the origins of which were disputed at trial. The altercation moved to the exterior of the residence where, at some point, the victim rubbed Appellant's face in the dirt. There was some testimony that the victim had a knife during the altercation. Appellant went back into the house, retrieved a shotgun, came back outside, and fired a shot that hit the victim in the shoulder area. Ms. Smith tried to intervene in the fight and stop Appellant, who hit her in the face with the gun. Appellant continued to follow the victim and shoot at him, eventually hitting him with a shot that was fatal. Appellant claimed that he shot the victim in self-defense. The jury discredited this testimony. Again, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). The evidence supports the conviction for second degree murder. Appellant is not entitled to relief on this issue.

### *Sentencing*

Appellant argues that his sentence is excessive. Additionally, Appellant argues that the trial court improperly enhanced the sentence based on the fact that the victim was particularly vulnerable and failed to find any mitigating factors. The State submits that the sentence was proper.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *See State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information

provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 705 n.41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, according to *Bise*, a "sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." 380 S.W.3d at 709.

After a review of the transcript from the sentencing hearing, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. In this case, the trial court sentenced Appellant to twenty-one years as a standard offender for the second degree murder of the victim, finding no mitigating factors and two enhancement factors: that the victim of the offense was particularly vulnerable because of physical disability[4] and that Appellant had a prior history of criminal convictions. *See* T.C.A. § 40-35-114(1), (4). The trial court's imposition of a twenty-one year sentence for the felony of second degree murder is affirmed. This issue is without merit.

### *Conclusion*[5]

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

---

[4]The trial court based this finding on the fact that the victim had been shot and disabled prior to Appellant firing the lethal shot.

[5]Appellant also argues that the cumulative errors of the trial court require this Court to reverse his convictions. Because we have found no error, we decline to address this issue on appeal.