IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2021 Session

## STATE OF TENNESSEE v. MICHAEL LYNCH

**Appeal from the Criminal Court for Knox County**
**No. 104245   G. Scott Green, Judge**

_____

**No. E2020-00930-CCA-R3-CD**

_____

After a Knox County jury convicted Defendant, Michael Lynch, of all six counts of the indictment, the trial court merged each alternative count, convicting Defendant of one count of theft of property valued at $10,000 or more, one count of theft of property valued at $2500 or more, and one count of attempted theft of property valued at $2500 or more. The trial court sentenced Defendant to a total effective sentence of fifteen years. After the denial of a motion for new trial, Defendant appealed, arguing that the trial court erred by: (1) denying a motion to suppress, (2) refusing to sever offenses; and (3) determining several of Defendant's prior convictions were admissible.[1] Defendant also challenges the sufficiency of the evidence. After a thorough review of the issues and record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

Forest Wallace, Knoxville, Tennessee, for the appellant, Michael Lynch.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phil Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Defendant was indicted by the Knox County Grand Jury in September of 2014 for six counts of theft from three separate businesses. Specifically, Defendant was charged

---

[1] Defendant abandoned this issue at oral argument. As a result, we will not address it on appeal.

with two counts of theft of property valued at least $10,000 but less than $60,000 from Paul's Oasis, two counts of theft of property valued at least $1000 but less than $10,000 belonging to James Roberson, and two counts of theft of property valued at least $1000 but less than $10,000 belonging to Julie Hemmings. The charges stemmed from the thefts of various HVAC units from the rear of businesses in the Knoxville area.

Prior to trial, Defendant asked the trial court to sever the three pairs of offenses. Defendant also sought suppression of his confession, arguing that he invoked his right to remain silent prior to his confession and that he was illegally seized at the time of this confession.

At the hearing on the motion to suppress, the State introduced proof indicating that police had a tip from an anonymous source that Defendant and Steven Phillips were responsible for or involved in HVAC thefts from a number of business locations around Knoxville. According to Investigator Todd Strickenberger, there had been a "rash of burglaries where unknown suspects were taking whole air conditioner parts from either industrial park areas or shopping center areas . . . cutting the wires and then taking the whole units." Police officers learned that Defendant was living at his father's house, taking the stolen HVAC units to his father's house, dismantling the units, and selling the parts for scrap. Police were told that the men were driving two different trucks - a red Mazda and a silver Dodge.

Officers performed surveillance of Defendant's house. One morning, as Defendant left the house in a truck, officers observed HVAC parts in the driveway near where the truck had been parked. The truck matched the description provided by the anonymous tip. Mr. Phillips was a passenger in the truck. Mr. Phillips was the subject of an outstanding warrant for a violation of probation. Officers stopped the truck and detained both men.

During the traffic stop, Defendant provided identification to the officers. Both men were placed in handcuffs and transported to the police station where Defendant was given his *Miranda* warnings.

Mr. Phillips implicated Defendant in the HVAC thefts. Defendant agreed to talk with officers. Defendant told Investigator Strickenberger that he understood his rights and was willing to talk. Defendant executed a waiver of rights form.

The trial court denied the motion to suppress. The trial court determined that the State had probable cause to arrest Defendant after the traffic stop based on the information from the private citizen identifying Defendant's truck and home. Moreover, the information was corroborated by the actual observations of the officers of the items at the

home and in the truck which were consistent with HVAC parts. The trial court also denied the motion to sever, finding that the thefts were part of a common scheme or plan.

At trial, the jury heard evidence about each of the separate incidents. Paul Osterbrink, the owner of a business called Paul's Oasis, recalled that the HVAC system for the business was located outside the rear of the business on the backside of a strip mall. On April 15, 2013, when he arrived to open the business for the day, he noticed that several of his HVAC units were missing. A third unit was "chopped up." The "lines were cut," and it appeared the third unit was moved from its original position at the rear of the business. The third unit was damaged and could not be repaired.

Mr. Osterbrink replaced all three units. The units were nine years old at the time they were replaced and in good condition. The replacement cost for the units was $10,550. Mr. Osterbrink did not give anyone permission to take the units.

During the investigation, surveillance footage from a nearby business captured images of a pickup truck leaving the scene at 6:44 a.m. The truck returned at 7:37 a.m. and left with the two HVAC units. The truck was consistent with one of the trucks Defendant and Mr. Phillips were known to drive.

Likewise, James Roberson, a commercial real estate broker, testified to a similar experience at an industrial property on Weisbrook Drive. In late March of 2013, Mr. Roberson was showing the property to a prospective tenant when he noticed that two HVAC units were missing. Mr. Roberson filed a police report. The next day, two more units were missing from the property. The day after that, the four remaining units were gone. The units were all replaced at an estimated cost of $30,000. No one had permission to take the units.

The building housing a Penn Station East Coast Sub Shop was managed by a real estate firm. Greg Trantanella, the facility manager for the building, testified that he received a call on April 15, 2013, from the owner of a neighboring restaurant to report a theft. When Mr. Trantanella arrived, he saw a pickup truck driving quickly away from the rear of the restaurant, where the HVAC units were located. As Mr. Trantanella reached the back of the business, he noticed that lines to two of the HVAC units had been cut and one of the units was moved from its original location. According to Mr. Trantanella, the units were valued at $4500 each, and no one had permission to remove them from the property.

Co-defendant Steven John Phillips also testified as a witness for the State. He met Defendant in "early April, maybe March" of 2013. He explained that he and Defendant were "out riding around basically looking for units" to take. They approached Paul's Oasis

and when "the guy come out back[, . . .] we took off." They came back about 45 minutes later and removed two air conditioning units from the rear of Paul's Oasis by placing the units in the back of Mr. Phillips's truck. They took the units back to Defendant's house "to scrap it and take it in." Mr. Phillips identified both his truck and Defendant in the surveillance video.

Later that same day, the pair went to a business "[r]ight over by Dick's Sporting Goods." At the business, which was the Penn Station sub shop, Defendant began to cut power lines to a unit when someone from a restaurant next door came outside and started hollering at the men. The men left without taking anything.

According to Mr. Phillips, approximately two weeks later, the men were stopped in Defendant's truck on Interstate 275. They were headed to the "scrap yard" to sell "[a] bunch of coils, compressors, . . . [and] some sheet metal."

After being arrested, Mr. Phillips did not initially tell the police what they were doing. Eventually, Mr. Phillips admitted his involvement and informed police about their actions. Mr. Phillips explained that he was "stupid" and "on pills." Mr. Phillips pled guilty for his crimes and received nine years of probation in addition to being ordered to pay restitution. Mr. Phillips claimed that he was a "whole lot better person" as a result of his convictions.

Investigator Strickenberger testified that he was investigating "business burglaries and scrap metal theft" of air conditioners and air conditioner parts in West Knoxville. During the investigation, after the thefts at Paul's Oasis, he received information from a confidential informant that prompted surveillance of Defendant's residence.

About two weeks later, Defendant and Mr. Phillips were "taken into custody" after a traffic stop. The men were in one of the trucks that was identified as being involved in the thefts. The bed of the truck contained "[a]ir conditioning components." When Defendant was interviewed, he initially denied involvement. Eventually, he admitted to riding in the truck with Mr. Phillips while he stole the units. Defendant explained that Mr. Phillips dismantled the units and took them to a recycling center. Defendant admitted that he was with Mr. Phillips at the Weisbrook Drive location but claimed Mr. Phillips was alone at Penn Station. Later, Defendant tried to say that someone else must have been with Mr. Phillips at Penn Station. Eventually, Defendant admitted that he was not only at Penn Station with Mr. Phillips but that he cut the lines on the unit before someone walked outside and spotted them. Defendant's recorded interview was introduced as an exhibit.

Defendant testified at trial that he spent most of his life in Knoxville. He worked a series of jobs primarily in the restaurant industry throughout his 20s and then got

certifications in "HVAC work." He started working in the HVAC industry at that point until a car accident in 2001 resulted in a "[p]retty substantial back injury" and eventual back surgery.

After the back surgery, Defendant struggled with addiction to pain medication. Defendant "picked up some criminal charges for forging prescription[s]" and pled guilty to aggravated burglary. Defendant spent time in incarceration as a result of the convictions. He also got a divorce. After he got out of prison, he struggled with addiction but managed to get a job with a local newspaper before pleading guilty to federal bank robbery. He received a sentence of 42 months in federal prison. When Defendant got out of federal prison, he lived in a halfway house before moving in with his father. Defendant was employed by a lawncare service as a supervisor but was "laid off" after an incident with a fellow employee named Randy Jones.

After Defendant was laid off, he got into "scrapping" with Mr. Jones and doing odd jobs. He met Mr. Phillips through Mr. Jones. Defendant went to the location off of Weisbrook Lane with Mr. Phillips. Defendant claimed he was under the impression that the property was being renovated and that they had "permission to go take the unit that was separated out over by the dumpster." Defendant thought that what they were doing "seemed legitimate" but admitted that he "really didn't ask to[o] many questions." They took the unit back to Defendant's house, disassembled it, and took it to the "scrap yard."

On April 15, Defendant met up with Mr. Phillips "with the intention of scrapping." Defendant explained that they would go "through dumpsters, . . . looking for cans, scrap steel" and other things. Mr. Phillips drove to Paul's Oasis and asked Defendant if he wanted to "grab these" units. Defendant waited in the truck while Mr. Phillips loaded the units. Mr. Phillips then drove over to "Randy's dad's house and threw the units out."

From there, Defendant explained that Mr. Phillips drove behind Dick's Sporting Goods, got out of the truck, and started cutting lines on a unit. Defendant and Mr. Phillips got into an argument as they were confronted by someone who came out the back door of a nearby business. They left the area. Defendant got out of the truck on Cedar Bluff Road and walked to his AA Group.

About a week later, Mr. Phillips called complaining that he needed money and help. Defendant agreed to let Mr. Phillips "tear down" some units that someone gave Defendant. Mr. Phillips came over and helped tear down the units. When the men left in a truck, they were apprehended by police. Defendant was upset and claimed he did not "intentionally" steal anything from the Weisbrook Drive location, Paul's Oasis, or Penn Station.

At the conclusion of the jury trial, the jury found Defendant guilty of two counts of theft valued over $10,000 from Paul's Oasis, two counts of theft valued over $2500 from Weisbrook Drive, one count of theft valued over $2500 from Penn Station, and one count of attempted theft valued over $2500 from Penn Station. The trial court amended the conviction for theft from Penn Station to attempted theft and merged each of the alternative counts, leaving one count of theft valued over $10,000, one count of theft valued over $2500 and one count of attempted theft valued over $2500. Defendant was sentenced to fifteen years as a Persistent Offender for Class C felony theft; twelve years as a Career Offender for Class D felony theft; and six years as a Career Offender for Class E felony theft. The sentences were ordered to be served concurrently, for a total effective sentence of fifteen years.

Defendant filed a motion for new trial which the trial court denied. Defendant filed a timely notice of appeal.

*Analysis*
*Denial of Severance*

On appeal, Defendant argues that the trial court erred by failing to sever the offenses for trial. Specifically, Defendant argues that the acts giving rise to the counts of the indictment were separate and distinct and not part of a "common scheme or plan" as contemplated by Rule 14 of the Tennessee Rules of Criminal Procedure. He argues that the events are a "string of similar offenses" that were more properly categorized as "crimes of opportunity" and not part of the same continuous transaction. Defendant argues that he should have been tried separately for each separate incident. The State disagrees.

A trial court's decision to join or sever offenses is reviewed on appeal for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). A trial court's denial of a motion to sever offenses will be reversed on appeal only when the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*. (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)); *see also State v. Goodwin*, 143 S.W.3d 771, 780 (Tenn. 2004); *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999).

Joinder of offenses may either be mandatory or permissive. *See* Tenn. R. Crim. P. 8(a), (b). Tennessee Rule of Criminal Procedure 8(b) states that two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). Tennessee Rule of Criminal Procedure 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. Rule 14(b)(1) provides that "[i]f two or more

offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

In examining a trial court's ruling on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. *See Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (quoting *Moore*, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. *Id.* (citations omitted).

This Court previously has concluded, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447. Typically, common scheme or plan evidence tends to fall into one of the following three categories: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. *Moore*, 6 S.W.3d at 240. Our supreme court has stated that "a larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004). "In such circumstances, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995).

Here, the trial court determined that the offenses were part of a common scheme or plan. The trial court noted that the offenses were distinct thefts of HVAC units in which the lines were cut prior to the removal of the units for scrapping. The trial court noted that offenses were "very closely connected in time" and Defendant's identity was a central issue to the case such that proof of one crime would necessarily be admissible to establish Defendant's identity in the other crimes.

Moreover, the evidence of how officers discovered each set of offenses would have been admissible at the trial of the other. Here, the trial court considered the requirements of the rule and determined that the motion for severance should not be granted. In our view, the trial court did not abuse its discretion by denying the motion to sever. Defendant is not entitled to relief on this issue.

*Denial of Motion to Suppress*

Next, Defendant argues that the trial court erred by denying the motion to suppress. Specifically, Defendant insists that he was illegally seized without probable cause or reasonable suspicion and that his subsequent "admissions" to police were the result of improper interrogation after Defendant invoked his right to remain silent. The State counters that the Defendant was arrested on the basis of probable cause and that he waived his *Miranda* rights before speaking with police.

In reviewing a motion to suppress, this Court will uphold the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). Additionally, our review of the trial court's application of the law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee protection from unreasonable searches and seizures. *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006). "However, neither the Fourth Amendment nor Article I, section 7 limit all contact between police and citizens." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000). There are three categories of police-citizen interaction: (1) a full-scale arrest which must be supported by probably cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification. *Id*.

An officer is permitted to make a warrantless arrest when a felony has been committed and the officer has probable cause to believe the person arrested committed it. T.C.A. § 40-7-103(a)(3); *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005). Probable cause exists when the facts and circumstances and reliable information known to the officer are sufficient to warrant a prudent person to believe that the arrested person either had committed or was committing an offense. *Id.* at 75-76. The determination of whether probable cause existed is fact-dependent, and this Court gives considerable deference to a trial court's determination that probable cause exists. *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017).

Additionally, the Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1982), the United States Supreme Court determined that, once a suspect asks for counsel, "additional safeguards" are required to protect the Fifth Amendment right against compelled self-incrimination and announced that:

> when [a suspect] has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A suspect], . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police.

*Id*. Then, in *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court stated that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459,

461 (emphasis in original). "Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013).

Here, Defendant argues that he was unlawfully seized when he was arrested, handcuffed, and taken to the police station after the police stopped Mr. Phillips on an outstanding warrant. The trial court heard the testimony at the suppression hearing concerning the outstanding warrant on Mr. Phillips. Defendant was a passenger in the truck which was seen leaving Defendant's residence. At the time of the stop, in addition to the outstanding warrant, officers were acting on information from a confidential informant regarding Defendant's involvement in the HVAC thefts. Moreover, the officers saw evidence of HVAC parts at Defendant's house just prior to the traffic stop.

Once at the station, Defendant was advised of his rights, waived those rights by signing a *Miranda* waiver, and spoke to the police even though he was informed that he was under arrest. During the interrogation, Defendant responded to a pointed question about whether he was with Mr. Phillips on April 13, during the commission of the theft at Paul's Oasis. He stated:

> I'm on the hot seat, so I don't know what to say. It's like, I don't want to say yes, I don't want to say no. What I don't want to do is say anything, because I don't know what he's said. I don't know what somebody else has said. Do you have photos? If you have photos show them to me, or if it's evidence that you have, show it to me and we'll go from there.

The trial court reviewed the evidence and found both probable cause for the arrest and that Defendant voluntarily waived his rights. We agree. Defendant never unequivocally invoked his right to remain silent or asked for a lawyer. The evidence does not preponderate against the judgment of the trial court. Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Finally, Defendant challenges the sufficiency of the convicting evidence. With respect to each conviction, he argues that his testimony was different from the other proof at trial and that the State failed to prove he was guilty. The State disagrees, arguing that the jury's verdict resolved all conflicts in the evidence in favor of the State and that Defendant is not entitled to relief on appeal.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The jury's verdict replaces

the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result" and "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(a), (b). The aggregate value of stolen property in multiple thefts may be used to support the grade of the theft offense "when separate acts of theft are: (1) from the same owner; (2) from the same location; and (3) are pursuant to continuing criminal impulse or a single sustained larcenous scheme." *State v. Cattone*, 968 S.W.2d 277, 279 (Tenn. 1998) (citing *State v. Byrd*, 968 S.W.2d 290 (Tenn. 1998). Theft of property is graded based on valuation of the property stolen. *Id.* § 39-14-105(a). Tennessee Code Annotated section 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

A conviction may not be based solely upon the uncorroborated testimony of an accomplice. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). Additionally, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). The Tennessee Supreme Court has held, however, that the corroboration required can be slight. In order to properly corroborate accomplice testimony:

There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. The corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw*, 37 S.W.3d at 903.

- 12 -

In the light most favorable to the State, surveillance video shows Mr. Phillips' truck at the rear of Paul's Oasis and eventually leaving with two HVAC units. Mr. Phillips identified Defendant as his accomplice, cutting the lines to three of the units and helping to load two units into the truck. While the third unit was not physically removed from the property, it was moved from its original location. *See State v. Nix*, 922 S.W.2d 894, 900-901 (Tenn. Crim. App. 1995). At the Weisbrook Drive location, the proof from the testimony of the property manager indicated that several units disappeared. The units were worth about $4000 each. Defendant admitted that he removed HVAC units from this location but claimed that he did not know he was stealing them. Finally, the evidence as to the attempted theft at Penn Station indicated that Defendant took substantial steps toward removing the HVAC units despite his claim that he was at the location as an unwilling participant. It is undisputed that Mr. Phillips is an accomplice of Defendant in this case. The record reflects that he was charged with crimes as a result of his involvement and pled guilty to offenses related to his actions. Mr. Phillips' testimony was corroborated by other witnesses who testified at Defendant's trial and evidence that was admitted at trial, namely surveillance video showing the truck driven by the two men and the observations of the officers of HVAC components in the yard at Defendant's house and in the back of the truck the men were in when they were arrested. In our view, the corroboration was sufficient to meet the standard announced in *Shaw*.

Moreover, despite Defendant's testimony that he was either not involved or did not know he was stealing the units, the jury heard that testimony and apparently rejected it. It was within their purview to do so as it is not our role to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277 (citing *Bland*, 958 S.W.2d at 659). The evidence supports Defendant's convictions for theft over $10,000 by obtaining and exercising control over HVAC parts at Paul's Oasis, theft over $2500 by obtaining and exercising control over HVAC parts at Weisbrook Drive, and attempted theft over $2500 at Penn Station. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE

- 13 -